**The DREYFUS FUND INCORPORATED, The Dreyfus Leverage Fund, Inc., Dreyfus Number Nine, Inc., The Dreyfus Special Income Fund, Inc., The Dreyfus Third Century Fund, Inc., Dreyfus Liquid Assets, Inc., Dreyfus Money Market Instruments, Inc., Dreyfus A Bonds Plus, Inc., Dreyfus Tax Exempt Bond Fund, Inc., Dreyfus Tax Exempt Money Market Fund Inc., The Dreyfus Corporation, Dreyfus Service Corporation, Dreyfus Management, Inc., and Dreyfus Gold Deposits, Inc., Plaintiffs,**

v.

**The ROYAL BANK OF CANADA, Defendant.**

**No. 81 Civ. 1583 (ADS).**

United States District Court, S. D. New York.

Nov. 6, 1981.

Stroock & Stroock & Lavan, Laurence Greenwald, Vivienne W. Nearing, Esq., Bruce H. Schneider, David Welkowitz, Amster, Rothstein & Engelberg, New York City, of counsel, for plaintiffs.

Kenyon & Kenyon, William T. Boland, Jr., Arthur D. Gray, Philip J. McCabe, New York City, of counsel, for defendant.

SOFAER, District Judge:

Plaintiffs have moved preliminarily to enjoin the defendant from continuing an advertising campaign that allegedly infringes

plaintiffs' registered and common law service marks, constitutes unfair competition, and dilutes plaintiffs' marks. Relief is sought for trademark infringement, 15 U.S.C. § 1114 (1964), for violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for trademark dilution under N.Y.Gen.Business Law § 368–d (McKinney 1968). Jurisdiction is based on 15 U.S.C. § 1121, 28 U.S.C. §§ 1332(a) & 1338, and on principles of pendent jurisdiction.

Plaintiffs (hereinafter "Dreyfus") are all members of the Dreyfus Group. The Group includes numerous open-end investment companies or "funds," corporations providing support services for the funds, a corporation managing retirement funds and assets for corporations and institutional clients, and a corporation providing gold investment services to the public. Dreyfus owns several registered service marks containing pictures of a real lion, or a representation of a lion. Plaintiffs' Exhibits ("PX") 14–24, 90–91. In addition, plaintiffs have used unregistered service marks of real lions or lion symbols for over 25 years. Transcript ("Tr.") 29 (testimony of Howard Stein). Defendant, The Royal Bank of Canada (hereinafter "Royal Bank"), is a Canadian corporation with its principal place of business in Montreal, and the offices throughout the world, including several in the United States.

This litigation focuses on the Royal Bank's "Edge" advertising campaign, which began in November 1980. The campaign consists of a series of advertisements that appeared and are scheduled to appear in various magazines and newspapers in the United States and elsewhere. The ads prominently feature a realistically portrayed lion in a variety of settings, e. g., walking out of a jungle, on an oil rig, and in a field of wheat. PX 130–41.

■ A preliminary injunction is proper only where the plaintiff establishes possible irreparable harm and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206–07 (2d Cir. 1979). *See Selchow & Richter Co. v. McGraw-Hill Book Co.,* 580 F.2d 25, 27 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone and Telegraph Co.,* 535 F.2d 1356, 1358 (2d Cir. 1976). In this case, Dreyfus has established the prerequisites for an injunction, limited to advertising that closely resembles Dreyfus' use of lions.

*I. Irreparable Harm*

■ A party seeking a preliminary injunction in a trademark infringement action need not prove that irreparable harm has already occurred. Rather, the movant may rely upon an inference of irreparable harm based on a showing that a danger of confusion exists in the minds of consumers. *See Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971); *George Washington Mint, Inc. v. Washington Mint, Inc.,* 349 F.Supp. 255, 263 (S.D.N.Y.1972). An inference of irreparable harm is permitted "[b]ecause of the trademark's unique function in representing intangible assets such as reputation and good will . . . and the consequent difficulties in measuring its value." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414, 429 (S.D.N.Y.1980). Discussing irreparable harm, the late Judge Gurfein noted: "It is not necessary to anticipate an actual diversion of buyers but only confusion. . . . [Infringement by a noncompetitor] would inevitably begin an attrition of the aura of exclusivity appropriated to the plaintiff's good will. It would tend to take the plaintiff's reputation out of its own control." *George Washington Mint, Inc. v. Washington Mint, Inc., supra,* 349 F.Supp. at 263 (citations omitted).

■ The potential for irreparable injury to Dreyfus is particularly great because of the nature and vulnerability of the lion symbol. During the 1950s, Dreyfus took the common symbol of a lion and, through years of creative and intensive advertising, combined with a good record of investment success, transformed that symbol into a

widely recognized, distinctive service mark in a particular area of commerce. Put another way, Dreyfus transformed an inherently weak mark into a distinctive and strong mark within the financial arena. But because the Dreyfus mark is based on a familiar subject, infringement is more likely than in cases with unfamiliar subjects to cause irreparable harm. The distinctiveness of the Dreyfus lion symbol developed over the years could be quickly ended. In this case the defendant's massive advertising campaign, in America's most prominent financial journals and magazines, is likely to cause irreparable harm to plaintiffs' marks if permitted to continue—for even a short time. PX 128, 144–59.

## II. *Likelihood of Success on the Merits*

The materials submitted by the parties and the testimony elicited during hearings over a three-day period demonstrate that Dreyfus is likely to succeed on the merits of this case, to the extent relief is here afforded. At minimum, Dreyfus has raised serious questions going to the merits.

■■ As in any infringement or unfair competition action, the fundamental question is whether plaintiffs will succeed in establishing that Royal Bank's advertising is likely to confuse consumers.[1] The likelihood of confusion depends in part upon whether the goods or services of the parties are similar or dissimilar. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2d Cir. 1979). Although important differences exist among the services offered by plaintiffs and defendant, particularly within the United States, some of their money management activities are similar in function and in form. As explained below, the money management field is a dynamic and changing area, in which mutual funds and

banks are engaged in competitive and cooperative new ventures. The services offered by plaintiffs and defendant are therefore sufficiently similar in fact and in the minds of consumers to warrant considering the factors analyzed in cases involving similar goods. Those factors include: (1) the strength of plaintiffs' marks; (2) the degree of similarity between plaintiffs' marks and the allegedly infringing uses; (3) the degree of similarity between the products; (4) the purpose of the defendant in adopting the mark; and (5) sophistication of consumers. Furthermore, even if this case is treated as one involving dissimilar services, an injunction would be proper, since the parties are in related fields of commerce, with actual and potential overlap in services. *See McGregor-Doniger v. Drizzle, Inc., supra.*

### A. *Strength of the Dreyfus Marks*

■ The strength of a mark, and therefore the protection afforded it by the law, depends initially upon its classification as generic, descriptive, suggestive, or arbitrary and fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). The lions used by Dreyfus cannot be classified as generic, descriptive or arbitrary marks; instead, they fall within the category of suggestive marks. As Judge Weinfeld stated in *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968), "[a] term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." A lion suggests power, control, leadership, and similar qualities, but does not immediately evoke thoughts of money management. The advertiser must make the con-

---

1. The statutory test for infringement is the likelihood of confusion. 15 U.S.C. § 1114 (1976). Actual confusion or deception of purchasers is not essential to a finding of trademark infringement or unfair competition. *See W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 661–62 (2d Cir. 1970). In this case, no definitive proof of actual confusion has been presented. The Bank's campaign had barely gotten underway when it was voluntarily discontinued pending the resolution of Dreyfus' motion; it has only recently been recommenced. Some indicia of actual confusion arose in responses of two interviewees in surveys conducted for the Bank, when without any question designed to test confusion, the interviewees stated that the Bank's ad reminded them of Dreyfus or another fund. PX 168–70. Plaintiffs will be permitted to investigate further the possibilities reflected by this evidence.

sumers identify those traits of a lion with its services. As a suggestive mark, Dreyfus' lions are entitled to protection without regard to evidence of secondary meaning. *McGregor-Doniger v. Drizzle, Inc., supra,* 599 F.2d at 1131; *West & Co. v. Arica Institute, Inc.,* 557 F.2d 338, 342 (2d Cir. 1977); *Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 10–11.

In addition to its classification as a suggestive mark, the Dreyfus lion has achieved very substantial "actual recognition among the consuming public." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., supra,* 486 F.Supp. at 420. Defendant does not even attempt to controvert plaintiffs' evidence of widespread and strong recognition of their lion marks between 1960 and about 1970. Dreyfus' President, Howard Stein, described how the lion came to be used as part of an advertising campaign implemented in the early 1960s to increase the Dreyfus Fund's total capital. One TV ad was especially successful: a lion emerged calmly, incongruously, from a subway station designated "Wall Street," and walked through auto or human traffic to a pedestal while a voice identified the Dreyfus Fund as an investment vehicle that takes "prudent risks" to achieve growth. Another particularly successful device, most recently run in 1976, was to print the Dreyfus Fund prospectus as a magazine supplement to the New York Times, with a lion mark on the cover. PX 35–53. Other advertisements followed the early TV ads in an effort to achieve widespread attention. Between 1965 and 1969, Dreyfus spent a total of $8.8 million on advertising, virtually all forms of which included lions.

The advertising program proved immensely successful. Between 1966 and 1969, the amount of money invested with the Dreyfus Fund increased from $1.6 billion to $2.4 billion. Promotional expenditures increased from $1.16 million in 1971 to $9.36 million in 1980, and once again virtually all advertising used lion imagery. By 1981, the total capital managed by Dreyfus reached over $10 billion. As Dreyfus grew, it diversified into other forms of fund management. Its advertising also diversified;

the television ads were discontinued, but the lion theme was used in the other advertising forms. When new funds were created, they became represented by a lioness, lion cubs, or a group of lions. PX 90–110; Grene Aff. ¶¶ 12 & 13. In 1974, Dreyfus began to use a stylized lion in addition to the realistic lions, in part because a picture could not be reproduced effectively in newspaper ads. PX 12–15, 120–22.

The recognition generated by Dreyfus' advertising is reflected in its commercial success. Mr. Stein credibly expressed the view that the Dreyfus lion contributed significantly to the company's growth. He testified that other mutual funds performed as well or better than Dreyfus during the years the lion regularly appeared on TV, but that they lacked growth records comparable to Dreyfus' record. Tr. 35–40. Furthermore, both the financial and advertising industries perceived the lion advertising as having been largely responsible for Dreyfus' success. The Lion-on-Wall-Street commercial won wide acclaim, and many prizes. Newspapers and magazines commented on the Dreyfus story, and regularly referred to the lion as a major responsible element. PX 57a–h, 62–63g. So distinctive (and aggressive) was Dreyfus' campaign, that it led to an inquiry by the staff of the Securities and Exchange Commission. Greene Dep. 73–77; PX 25.

In the process, Dreyfus became associated with its lion in the financial arena. As examples of the overwhelming evidence of that association, plaintiff introduced the August 24, 1970, issue of *Time* magazine. On the cover of that issue is a portrait featuring half the face of Mr. Stein and half the face of the Dreyfus lion. PX 63h. In this manner, *Time* communicated the message that its story was about Dreyfus, and that Stein was the man behind the lion's success. Evidence was also introduced of consumer identification of a lion with Dreyfus in cartoons and illustrations. Tr. 172. These demonstrate widespread consumer recognition, because they show that cartoonists and their publishers were confident that pictures or drawings of a

lion, in a financially oriented context, would be widely understood to represent an investment company called Dreyfus.

Defendant's response to this history of widespread recognition is more rhetorical than substantive. Thus, defendant notes that Dreyfus has used many different lion marks, and states therefore that Dreyfus is claiming "that all lions belong to Dreyfus." Def. Mem. in Opposition at 17. Defendant argues that a popular animal is an inherently weak mark, in any event, and that lions have been used in association with hundreds of goods and services, including banks. Furthermore, defendant contends that the Dreyfus ads allegedly similar to its own are dated; "virtually all the so-called popular recognition is dated over five years ago and most of it over ten years ago." *Id.* at 20. The lion used today is, moreover, allegedly a stylized lion within the letter "D" or with the word "Dreyfus," adopted by plaintiffs' executives because they wanted to project a uniform image. Although claiming that plaintiffs' arguments against abandonment are "a Red Herring," because the Royal Bank does not "on this motion" claim that plaintiffs have "formally abandoned their marks," defendant nevertheless in fact argues that plaintiffs "now try to *resurrect* its old realistic lion marks in an attempt to interfere with the Royal Bank's advertising campaign." *Id.* at 21 (emphasis added).

Plaintiffs' claims are more limited than defendant suggests. Dreyfus agrees, for example, that defendant is free to utilize stylized lions and its own lion logo. For example, while Dreyfus objects to the Bank's recent ads that contain realistic lions, Dreyfus concedes that the Bank may lawfully print its lion logo on full-page ads, seeking to convey the same message. However broad Dreyfus' claims may be, moreover, the concrete issue posed in this case is whether plaintiffs should be protected against the lion ads defendant has actually published or intends to publish. Some of those ads are very similar to the ads widely run by Dreyfus from five to ten years ago, and have been planned for publication in newspapers and periodicals with widespread readership, particularly in the financial arena.

While lions are commonly used in advertising, it does not follow that all marks utilizing lions must therefore be weak. Plaintiffs are not entitled to protection from all lion marks. The Dreyfus lions have no proven strength as marks in fields unrelated to finance. Even in the area of finance, plaintiffs' evidence of strength is largely related to the lions it has in fact used, and those it continues to use, and is also geographically limited to the United States. Where, as in this case, a common subject has "been used in a suggestive manner courts have readily granted protection from similar marks." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., supra,* 486 F.Supp. at 421. Dissimilar lions, used in dissimilar advertising, or in different geographic areas, are not at issue here. Nor was Dreyfus under any obligation to police dissimilar uses of lions, or the use of similar lions by foreign banks in foreign advertising. *Id.* at 423; 4 T. Callman, *Unfair Competition, Trademarks and Monopolies* § 87.-33(e), at 152 (3d ed. 1970) [hereinafter "Callman"]. In fact, the hundreds of other uses of lions, and the use of lions by foreign banks, in foreign publications, tends only to show just how strong plaintiffs' marks are within the limited commercial and geographic area at issue in this litigation. Despite the widespread use of lions, plaintiffs have been able to gain broad recognition through their lion ads as an investment-oriented company in the United States.

■ Defendant is correct in claiming that Dreyfus has not shown the Lion-on-Wall-Street ad since approximately 1975, and since then has generally used drawings of a lion within a "D" or near the word Dreyfus. But defendant exaggerates the extent to which Dreyfus has allowed its original lion image to lapse, and misstates the legal significance of Dreyfus' recent advertising decisions. First, while Dreyfus has not used TV ads since approximately 1975, that amount of time is hardly so great a lapse as to justify shifting the burden, from defendant to plaintiffs, on the ques-

tion whether the mark's relatively recent strength has dissipated. During the intervening years, Dreyfus has continued to use lions consistently with continued recognition and strength. Since 1974, Dreyfus has used a drawing of a stylized lion in connection with all of its funds, but that drawing is itself based directly upon a picture of the same lion used in the TV ads, PX 2–10, designed because the picture could not successfully be used and printed in the relatively small format currently used to promote Dreyfus. Tr. 49. Dreyfus has also continued to use pictures of realistic lions for particular funds. PX 1, 107, 109, 120–22, 190–96. Dreyfus recently ran an ad in *Pension & Investment* magazine that contained only a picture of its lion with no corporate identification. The ad nevertheless succeeded in generating interest and business for Dreyfus, demonstrating continued recognition of the lion symbol at least among that particular readership. *See* PX 23–25. In 1980, Dreyfus introduced a periodic newsletter entitled "Letter from the Lion," which does not even bear the name Dreyfus on its masthead. PX 23–25. Stein testified, moreover, that plans have been made for a new television advertising campaign, and at least one ad had been filmed before defendant's "Edge" campaign got underway. He also plans to revive the Lion-on-Wall-Street ad, once consumers again become interested again in buying common-stock funds. Tr. 56–68; Mead Dep. 42–46, PX 197–99.

Even if Dreyfus had used only its lion drawing in recent years and no other forms of lion advertising, the manner and frequency of Dreyfus' use of the lion drawing do not require an inference of reduced strength. The drawing strongly resembles the realistic lion in the TV ads, and may well suffice to remind readers, even subliminally, of the association with Dreyfus. The lion drawing has also been used so extensively that its potential as a reminder cannot lightly be dismissed. Promotional spending by Dreyfus has increased from $1.16 million in 1971 to $9.36 million in 1980, and media advertising has increased during the same period from $0.57 million to $3.80 million. Virtually all these efforts rely in part on lion imagery. The likelihood of consumer association with Dreyfus is also suggested by Dreyfus' continued success, and the tremendous increase in the amount of money it manages.

■ "The law permits a user who changes the *form* of its mark to retain the benefit of its use of the earlier form, without abandonment, if the new and old forms create the same, continuing commercial impression." *Ilco Corp. v. Ideal Security Hardware Corp.*, 527 F.2d 1221, 1224 (C.C.P.A.1976). In this case, the user has only recently changed the form of its marks, and for a reason that lends no support to an alleged lack of resolve to maintain the strength of its older forms. The shift has occurred only because investment patterns have changed, mandating changes in the type and scale of advertising. Tr. 57 (testimony of Howard Stein). A trademark owner is not required to maintain any particular level or type of advertising to avoid the abandonment or weakening of its mark. The owner must only continue to use the mark in a manner that preserves its consumer recognition or distinctiveness. *See Anvil Brand, Inc. v. Consolidated Foods Corp.*, 464 F.Supp. 474, 481 (S.D.N.Y.1978). One of the benefits of a strong mark—and an aspect of its value—is the owner's well-earned capacity to achieve a high degree of consumer recognition (and response) with less costly forms of advertising than had been necessary to establish the mark's strength. Defendant's arguments that Dreyfus' original forms have lost their strength are at this stage unsupported by evidence, and given the relatively recent use of those forms, their similarity to present forms, and Dreyfus' continued vigorous use of lions and its future plans, defendant cannot in effect obtain a finding of abandonment, particularly at this preliminary stage, without carrying a greater burden.

■ Dreyfus also sought to show continued strong recognition of its mark by introducing the results of a pilot study for a

survey it is preparing in connection with this litigation. Surveys are frequently used in trademark litigation and are recognized by courts as a way of demonstrating secondary meaning or a likelihood of confusion. To be probative and meaningful, however, surveys must be impartially prepared and implemented by competent professionals, and must rely upon responses by potential consumers of the products in question. The pilot study conducted for the plaintiff in this case was designed to meet those criteria. Plaintiff hired a professional consultant who prepared arguably relevant questions and provided that the answers would be rewarded. The questions were to be posed to a random group of persons likely to see the Bank's advertisements and likely to consider procuring investment services. The results of the Dreyfus pilot study indicate that a high proportion of readers of the *New York Times* and the *Wall Street Journal* (53.5% and 75%) associated a picture of a lion—actually used by the Royal Bank in its new campaign—with Dreyfus. Virtually no one questioned associated the lion with the Royal Bank.[2] These statistics tend to support an inference of confusion among potential consumers. In the past, facially weaker test results have been "held sufficient . . . to support in part an inference that confusion is likely." *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 386 (7th Cir. 1976).[3]

No weight can be given to the Dreyfus study at this point, however, because its execution was seriously flawed. At the hearing, Dr. Sidney I. Lirtzman, plaintiffs' expert witness who designed the study, testified that the questionnaires were not administered according to his instructions. Specifically, Dr. Lirtzman testified that approximately half of the respondents had not been selected in a manner designed to ensure a random sampling. Tr. 307–321. Arguably, the study tentatively supports the view that the Dreyfus mark became so established during the 1960s, at least among some readers, that its strength was maintained by the modified advertising program implemented by Dreyfus since about 1974. But a definitive appraisal must await the proper conclusion of the final survey. Meanwhile, discounting the study's results entirely for purposes of the present motion, plaintiff is nevertheless likely to establish that its lion marks remain strong today, and therefore are marks entitled to a high degree of protection.

B. *Similarity of the Marks*

Defendant's advertising campaign is centered around images and ideas that are remarkably similar to the Dreyfus marks and to the manner in which the Dreyfus marks have been used. The Royal Bank does not even dispute that its ads are similar to those Dreyfus used over five or ten years ago; rather, it concentrates its argument on the contention that the similarities are unlikely to cause confusion. The confusion issue is dealt with below. At this point the similarities must be more extensively described, since similarity is a separate consideration pertinent both to the issue of confusion and to the likelihood of intentional copying.

The lion used by Royal Bank is painted, but is nevertheless very much like the Dreyfus lion in appearance. Furthermore, the

---

2. The pilot study conducted for Dreyfus consisted of two parts. In the unaided survey 28 people were given corporate symbols and asked to identify the corporation represented. The responses elicited by the lion symbol in the unaided survey are as follow: 15 people associated the lion with Dreyfus, 2 with MGM, 1 with a stock broker, 1 with a magazine, 1 with an insurance company, 1 with Lehman Brothers, 6 with no corporation. Tr. 183. In the aided part of the survey 28 people were shown a number of corporate symbols and were asked to select from a list of names the corporation represented by each symbol. The responses to the lion symbol were as follows: 21 people associated the lion with Dreyfus, 1 with Hartford Insurance Company, 2 with the Royal Bank of Canada, 2 with Exxon, and 2 made no association at all. Tr. 186.

3. If the final survey is conducted as unreliably as the pilot study, it could be given no weight. The parties should attempt in good faith to agree upon the questions to be included in the final survey. *See Union Carbide Corp. v. Ever Ready Inc.*, supra, 531 F.2d at 387.

creative advertising technique of the Lion-On-Wall-Street ads, that of using the lion in an anomolous, financially oriented setting, is the very technique used by Royal Bank in its "Edge" campaign, by placing a similar lion in a wheat field, on a beach, and on an oil rig. The Royal Bank's ad placing the same lion in a jungle setting, and claiming an "edge" in the "money jungle," is virtually identical to the "money jungle" ad run by Dreyfus several years ago. PX 164 and 144. Both ads feature a lion surrounded by exotic flora and fauna. Both refer to the money jungle in bold type at the top, and both have bold type followed by paragraphs of additional information at the bottom. Other than the different company names, the only difference between the two ads is the posture of the lion; he is lying on the ground in the Dreyfus ad and standing in the Royal Bank ad. This relatively minor distinction is, however, made even less significant by the fact that the reclining Royal Bank lion is almost identical to a reclining lion pictured in a registered Dreyfus symbol used in Dreyfus' Lion-On-Wall-Street ads. PX 20. Royal Bank executives have recognized the "unfortunate coincidental similarity" of the "money jungle" ad and the Dreyfus lion as most recently depicted on the 1980 Annual Report of Dreyfus Fund. Grier Dep. 160–61; PX 128, 44–49, 196.

The Royal Bank also overstates the differences between its present advertising and Dreyfus' present advertising. Over the years Dreyfus has utilized a variety of lion images, including a lion in a "D," a real male lion, lion cubs, and a lioness. These symbols, used separately and together as a lion family, have symbolized the "Dreyfus family of Funds." Tr. 43–47. The Royal Bank's "Edge" campaign also features ads portraying a family of lions. Furthermore, Dreyfus still runs ads and publishes material with pictures of real lions very similar in appearance to the lion used by the Royal Bank. These real lions, and the stylized lion based upon the Dreyfus lion, all appear reminiscent of the earlier Dreyfus materials, and therefore the heavy dose of lion imagery published by Dreyfus may well lead consumers to be more affected by the similarities between the Royal Bank and Dreyfus ads than by their dissimilarities.

Defendant properly notes that the similarity of its use of lions to those of Dreyfus must be judged by examining the ads as a whole. "It is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important." 2 J. McCarthy, *Trademarks and Unfair Competition* 56 (1973). The Royal Bank ads contain, not only the realistic lion, but also the Bank's logo which includes its registered heraldic lion, and titles that make clear it is the Bank that is advertising. Furthermore, the Bank argues, its use of lions differs from Dreyfus' use; whereas the Bank uses lions only as part of its "Edge" campaign, as a symbol of an animal that itself has an edge in the jungle, Dreyfus uses the lion as its mark.

The overall impression of the Bank's ad, however, does remind one strongly of Dreyfus ads. The Bank's simultaneous use of its logo, and of its name, are useful in avoiding the possibility of confusion, but they are relatively insignificant elements in defendant's advertisements. The lion predominates, as the Bank intended. Moreover, the Bank's surveys confirm this impression, indicating that readers will notice the lion more than any other element. *See* Def. Mem. in Opposition at 34. Using the lion to advance the theme that Royal Bank has an "Edge" does not significantly differ from Dreyfus' intentions in using the lion. Both parties seek to convey the same impression in using lions, and to attain the same identification and associational advantages. *See* 3 Callman, *supra*, § 85.2(c), at 1035; 1 J. McCarthy, *supra*, § 3.5, at 95–96. Adding the trite notion of an "Edge" to the Bank's advertising does not appear to dispel its overall similarity to Dreyfus' advertising.

So long as the Royal Bank has failed to refute the inference of continuing recognition and strength derived by Dreyfus from its earlier ads, the Court cannot disregard strong similarities between the Bank's present ads and the earlier Dreyfus

materials. Otherwise, the Bank would in effect be able to destroy the strength and distinctiveness of the plaintiffs' present marks, by copying and thereby nullifying the distinctiveness of the forms from which the present marks were derived and from which they in turn derive their distinctiveness.

## C. *Similarity of Services*

The Royal Bank contends that it and Dreyfus do not compete in the United States. Dreyfus consists of open-end investment companies selling mutual fund shares to the public, a company serving as an investment advisor, another that acts as sales agent, a company that manages retirement funds and endowment assets, and one that buys gold for the general public. The Royal Bank, by contrast, offers no mutual funds within the United States, does not act as an investment advisor or sales agent for mutual funds in this country, manages only one pension fund—for its own employees, and offers no services in buying or selling gold. Its banking activities in the United States are limited. It claims it is involved only in "wholesale banking," confined to financial transactions with large institutions such as other banks, multi-national corporations, and state and municipal governments. Def.Mem. in Opposition at 25. Its "prime target" allegedly consists of corporations with sales of over $100 million, for which it makes loans, and provides advice on foreign exchange transactions and other complicated matters. The Royal Bank offices within the United States are "representative offices," marketing its "global service capability" to major companies, banks, and governments, "but do not engage in banking transactions for individual depositors." The Bank has four "agencies" in this country performing "limited banking functions, but three of these are not permitted to accept deposits from U.S. residents, and the fourth (in Portland, Oregon) cannot accept deposits from U.S. residents of less than $100,000." *Id.* at 25–26.

Dreyfus sees the matter differently, and its arguments raise several disputed issues of fact concerning the Royal Bank's activities in this country. For example, Dreyfus claims the Bank manages trust accounts through a New York subsidiary, *see* Grier Dep. 75–76, which is a function similar to Dreyfus' investment advisor functions, *see Board of Governors, Fed. Reserve System v. Investment Co. Institute*, 450 U.S. 46, 101 S.Ct. 973, 981, 67 L.Ed.2d 36 (1981). Putting aside the unresolved conflicts, however, the evidence is now sufficient to establish that an underlying similarity in function exists between Dreyfus and the Royal Bank, which in turn makes likely an increasing overlap between them in the services they now provide and may come to provide. Whether direct competition between these two parties actually develops cannot be predicted, but a sufficient relationship exists between their present services to make it reasonable to expect that consumers might confuse them or the services they offer.

A bank is not a mutual fund. Yet, one of the principal purposes of all banks is to manage money, and Royal Bank is no exception in this regard. In this fundamental sense, the Royal Bank and Dreyfus are in the same line of commerce, and to some extent may even compete for the same investor dollars; certainly, and perhaps more to the point, banks in general and money-market funds compete intensively for the same dollars. Within the United States, the Royal Bank has numerous offices, several agencies, and at least one vehicle for accepting deposits. That the Bank's primary focus may be on providing so-called wholesale banking services to large corporations does not make its presence here insignificant as far as Dreyfus is concerned. Dreyfus competes actively to manage the funds of large corporations, foundations, and other sizable entities. Among its services is one it offers with the Bank of New York whereby corporations can order that sums above a stated maximum in their checking accounts be swept automatically into a Dreyfus money-market fund. Furthermore, although the Bank claims it wishes only to engage in "wholesale" banking in this country, its Edge campaign ad-

vertising would reach millions of potential customers (including all readers of the *Wall Street Journal* and the *New York Times*), and the ads are aimed at increasing the Bank's recognition generally, not merely at selling specialized services to a limited clientele. Given the fact that the Bank provides the full range of commercial and merchant banking services in Canada and other nations, Pl.Proposed Findings Nos. 61 & 63, an increase in recognition within the United States would contribute to the feasibility of extending its services here. The "Edge" campaign may in fact have been designed to enhance the prospects of a successful expansion of the Bank's functions in the United States. Though the Bank may disavow an intent to expand, it does not disavow the possibility. Further discovery may develop more definitive information on the Bank's future aims. Meanwhile, it seems reasonable to assume that the gap between the Bank and Dreyfus may be narrowed over time. The Bank has ample resources to enable it to expand its banking, cash-management, and investment activities from Canada to the United States, and it has a history of aggressive growth in new markets. Mr. Hardy, a Vice President of the Royal Bank, testified that in the past the Bank placed "tremendous importance on expansion outside Canada in our retail business." Tr. 151.

The actual and potential activities of the Royal Bank are only one side of the issue whether the parties are active in the same product market. The other side of this issue is Dreyfus. Concededly, Dreyfus, and other mutual funds, are not banks. But many banks might wish that the line between funds and banks were more distinct. Some of the services currently offered by Dreyfus are nearly identical to those offered by banks; for example, Dreyfus at this time offers a service through its Liquid Assets Fund that permits a customer to write "checks" against his or her Dreyfus account. Dreyfus also plans to provide overdraft protection to Liquid Asset clients, much the way banks now permit customers to write checks for amounts greater than their existing balances. Tr. at 64–65. This

will, of course, put Dreyfus in the business of lending money. As Mr. Stein testified, the field of money management is in a dynamic stage, in which traditional distinctions are rapidly disappearing. Dreyfus has already entered into cooperative arrangements with some banks, to enable it in effect to compete directly with other banks. *See* Tr. 64–69, 90–91 (testimony of Howard Stein). Some of these cooperative ventures have been advertised by joint display of the Dreyfus and cooperating bank symbols.

The Royal Bank is correct in contending that its services are not in direct competition with Dreyfus. But the potential for competition between these two entities is substantial. The parties are in the same area of commerce in that they seek to assist companies and individuals in managing money. The "likelihood that the prior owner [Dreyfus] will bridge the gap" and offer services similar to those of the alleged infringer, *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), is also substantial. Dreyfus is likely to continue aggressively to pursue business traditionally handled by banks, either through affiliations with banks or through its own competitive ventures. And the prospect that the Royal Bank will become one of Dreyfus' competitors in cash-management and other investment activities within the United States may not be disregarded. *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.*, 308 F.2d 196, 198 (2d Cir. 1962).

Finally, the lack of direct competition between these particular parties should be given no more significance than it deserves. The issue here is not simply whether Royal Bank does or may engage in commercial activities that compete with, or are closely related to, activities of Dreyfus. We examine that question to develop evidence probative of the likelihood that consumers might be confused by the Bank's use of a mark very similar to one owned by Dreyfus. Consequently, the Bank's actual intentions, and Dreyfus' particular activities, are not controlling. "[T]he expansion of business factor turns not so much on objective evidence of actual expansion or potential

therefor as it does on whether it is reasonable for the ordinary purchaser to assume such expansion . . . ." *E. I. Dupont de Nemours and Co. v. Yoshid Int'l Inc.*, 393 F.Supp. 502, 517–18 (E.D.N.Y.1975). The Royal Bank's size, its massive campaign, and the fact that it is a bank in the eyes of consumers, not necessarily a Canadian bank seeking "wholesale" business, makes it likely that it will be perceived as offering a broad range of money-management services. On the other hand, Dreyfus as a mutual fund operation is likely to be perceived at this time as a company that is competing with banks. In short, irrespective of the absence of direct competition between the parties, they are in an area of commercial activity where consumers will perceive a substantial degree of competitive (and cooperative) overlap.

### D. *Defendant's Purpose in Utilizing Lions*

Defendant claims that it acted in good faith when it authorized the use of lions in its advertising campaign. It notes that its own trademark and logo contain a lion, and argues that the agency it hired to prepare its advertising quite logically proposed as one option that the bank use lions. Defendant asserts that its choice made sense, and was based entirely on its determination that lions would be the most appropriate and effective feature for its plan to increase its international renown. The Bank claims it chose a lion because the lion is royalty in the jungle, lions are dignified, they had previously been used by other banks, and they were already associated with the Royal Bank.

A conclusive determination regarding the defendant's intent must await a full trial. It now appears, however, that the defendant deliberately adopted themes, symbols, and advertising strategy knowing they were remarkably similar to Dreyfus'. Prior to November 1980, the Bank had never used a realistic lion in its advertising, only an heraldic lion logo, dissimilar to the Dreyfus marks. Furthermore, despite the defendant's explanation, it is difficult to believe that the paintings of lions adopted by the Bank were not copied from the Dreyfus lions. The paintings are realistic and, therefore, have the same appearance as photographs. But assuming that the similarity in appearance of the lions could be explained by the fact that lions look alike, it seems extremely unlikely that the Bank's advertising agency just happened on the idea of placing the lion in contexts that related to the Bank's work, or on the idea of using a family of lions to represent different Bank functions, or on the theme of lions being king of the "money jungle." These features strongly suggest an attempt to copy Dreyfus' advertising strategy, and thereby to capitalize on Dreyfus' reputation and popularity through conscious or unconscious association among consumers.

The defendant's officers claimed throughout discovery that "no Dreyfus advertising was reviewed" before adopting the lion symbol, because confusion was not anticipated. Def. Brief at 42. Had even a superficial review been conducted, the Dreyfus marks would have been found in Class 102 in the records of the U.S. Trademark Office, along with all registrations dealing with financial services, including the Royal Bank's own mark. In fact, the Dreyfus mark is recorded in the relevant Canadian records as well. Bergen Dep. 43–44; PX 17,20,23, 70–71, 90, 179, 196. Mr. Bergen, the defendant's advertising manager, testified that he was unaware of anyone who believed that Dreyfus was or is associated with the Royal Bank. Tr. 286. Given the renown of Dreyfus' advertising during the 1960s, however, it seems at least an open question whether the professionals in the advertising firm hired by Dreyfus had seen the Dreyfus campaign materials. In response to a discovery request, the Bank produced a July 1979 article from *Bank Marketing*, citing Dreyfus' lion as an example of animal symbolism in advertising. Pl. Proposed Finding No. 74. *See also* Roncarelli Dep. 98–99 (indicating that the witness knew of the Dreyfus lion in 1973 and 1974). When questioned by the Court at the hearing, Mr. Bergen admitted that during the initial presentation of the lion-centered campaign at least one Royal Bank official noticed its similarity to the Dreyfus cam-

paign. Bergen stated at the hearing that "the Dreyfus lion was raised at the very first discussion that we had about using a lion." Tr. at 292. But the project went ahead nevertheless, allegedly because the Bank believed that no one would confuse it with Dreyfus.

■ The Royal Bank's awareness from the outset of the similarity of the two campaigns is significant. Proof of such knowledge "has often been relied upon as evidence of bad faith and an intention to trade upon another's good will. A wrongful intent appears easy to infer where the defendant knew of the plaintiff's mark, had freedom to choose any mark, and 'just happened' to choose a mark confusingly similar to plaintiff's mark." 2 J. McCarthy, *supra*, § 23:33, at 107. "Where we can perceive freedom of choice with full knowledge of a senior user's mark, we can readily read into a defendant's choice of a confusingly similar mark the intent to get a free ride upon the reputation of a well known mark." *Id.* at 108. Like the defendant in *Miller Brewing Co. v. Carling O'Keefe Breweries*, 452 F.Supp. 429 (W.D.N.Y.1978), the Royal Bank began its campaign "subsequent to [the plaintiffs'] considerable success in promoting its [product] throughout the United States ... [;] an inference of conscious imitation" from the similarity in themes and symbols used in advertising by both parties therefore seems warranted. *Id.* at 448.

An inference of intentional copying, with the hope of gaining an advantage because of consumer familiarity with the Dreyfus mark, theoretically is consistent with a genuine belief on the Bank's part that no confusion as to product or source would result from its decision. The Bank's contention concerning confusion is based upon the dissimilarity in services offered by the Bank and Dreyfus, the present lack of significant business activity by the Bank in the United States, the relative sophistication of the consumers involved, and the information-gathering steps normally necessary before consumers acquire the services either of Dreyfus or of the Bank. Even if these assumptions are true, however, the Bank still had substantial motivation for copying the Dreyfus campaign. The "Edge" campaign is an effort to raise the public's awareness of the Bank, which its advertising manager concedes is very low. Tr. 269. By utilizing symbols and ideas from a campaign known to have succeeded in the same financial community in which the Bank is seeking greater recognition, the Bank could have anticipated (and probably would obtain) much more attention and recognition for its advertising effort than it could anticipate obtaining if it used unfamiliar symbols and techniques, not already associated with a successful advertising campaign. The evidence currently in the record strongly suggests that the Bank acted with the intention of exploiting the Dreyfus symbols and campaign, even if it did not also intend to cause consumer confusion as to source or product. To the extent that any doubt exists as to the proof of likelihood of confusion, the Court's tentative finding of intentional copying supports a decision in the plaintiff's favor. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157 (9th Cir. 1963).

E. *Sophistication of Purchasers*

Royal Bank claims there is no chance of confusion in this case because of its advertising aims, the sophistication of the relevant consumers, and the careful manner in which consumers do business with the Bank or Dreyfus. *See Taylor Wine Co. v. Bully Hill Vinyards, Inc.*, 569 F.2d 731 (2d Cir. 1978); *McGregor-Doniger, Inc. v. Drizzle, Inc., supra*. The Royal Bank maintains that its ad campaign is directed toward "financial decision makers in multinational corporations having annual sales of more than $1,000,000." Def. Brief at 137. Dreyfus, on the other hand, uses "its mass media advertising and direct solicitation [to reach] ... a very broad spectrum of potential investors." Pl. Brief at 24. Even Dreyfus' customers are relatively sophisticated individuals, capable of determining with whom they are placing their resources. The degree of inquiry such individuals are likely to make before deciding to purchase services is so

thorough as virtually to preclude confusion as to the product or services offered by Dreyfus and the Bank. In addition, intermediaries who are likely to be knowledgeable of the services involved, and of whether any relationship exists between the companies, are often used by customers of both Dreyfus and the Bank. Thus, by the time an actual purchase of services occurs, the Bank contends, neither confusion as to product nor as to source is likely.

The Bank's arguments are cogent. Royal Bank is not seeking Dreyfus' customers, and may in fact have no desire to be confused with Dreyfus. Its motivation appears primarily to be to take advantage of Dreyfus' creative and successful advertising efforts. Nevertheless, the Bank's use of its lion ads seems likely to cause recognized forms of confusion.

First, as noted above, whatever the Bank's alleged target may be, its advertising campaign is designed to reach the entire financial community of the United States, including many consumers of mutual fund and banking services who are far less sophisticated than corporate managers. This broad impact is consistent with Royal Bank's avcwed aim in adopting the "Edge" campaign—to increase its recognition worldwide, as would befit the continent's fourth largest bank. Furthermore, the industry involved cannot be treated as static. Consumer perceptions and behavior will depend on the service mix offered by Dreyfus, Royal Bank, and other funds and banks in the industry. That mix is changing rapidly, and seems likely to change radically over the next few years. Testimony offered at the hearing indicated that in the near future banks and funds will continue to extend their activities and services into each other's traditional areas of operation and into new areas jointly or competitively. Banks in particular are under pressure to respond to new money-management situations. See, e. g., New York Times, Aug. 19, 1981, at D1, col.2 ("For the Banks, It's Change or Perish").

The Bank assumes in its arguments that the statutory requirement of consumer confusion is one that requires a showing that consumers will confuse the services of the Bank and Dreyfus, and will remain confused throughout the process of actually purchasing those services. This is not so. See Grotrian, Helfferich, Schultz, Nachf v. Steinway & Sons, 365 F.Supp. 707, 715–16 (S.D.N.Y.1973), rev'd in part, 523 F.2d 1331 (2d Cir. 1975). The law requires only that some form of confusion be proved likely, not that it be shown to persist and to cause lost sales. The Lanham Act is broadly aimed at protecting the effectiveness of marks and, as a result, courts are regularly called upon to decide whether to enjoin the use of similar marks where a recognized form of confusion might be resolved by close customer scrutiny or attention to distinguishing words or phrases. See, e. g., La Touraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115 (2d Cir. 1946); Application of Calgon Corp., 435 F.2d 596 (C.C.P.A.1971); In re Triple R Manufacturing Corp., 168 U.S.P.Q. (BNA) 447 (TMT App.Bd.1970).

In this case, plaintiffs' advertising could be detrimental to Dreyfus in that potential customers could be confused as to the source of the services offered, or as to sponsorship. See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, supra, 604 F.2d at 204–05; Playboy Enterprises, Inc., v. Chuckleberry Publishing, Inc., supra, 486 F.Supp. at 428. Consumers might conclude after seeing the ads, as Mr. Stein testified, that a connection exists between the Bank and Dreyfus. Congress sought to prevent precisely such confusion in the Lanham Act. 1 J. McCarthy, supra, § 2.2, at 44–45. Confusion in this case also undercuts Dreyfus' status as a separate, independent entity operating in the financial world. Although the Bank fails to see how Dreyfus could be harmed by anyone's associating it with a reputable and prestigious, financial giant, such as the Royal Bank, Mr. Stein testified that such an association would, in fact, be detrimental to Dreyfus. Tr. 70, 105. Being associated with a bank in the competition for moneys to manage is, at this time, in Stein's uncontroverted view, a real disadvantage because banks are thought of as ineffective, uncreative, and slow to change.

The confusion caused by Royal Bank's ads need not, moreover, be overt or obvious to warrant preliminary relief. *See London Manufacturing Co. v. Cable Raincoat Co.*, 371 F.Supp. 1114, 1118 (S.D.N.Y. 1974); *Grotrian, Helfferich, Schultz, Nachf v. Steinway & Sons, supra*, 365 F.Supp. at 717. For many years, plaintiffs repeatedly exposed the financial community and investors to an advertising campaign designed to establish a realistic lion as the symbol for Dreyfus funds and services. That exposure appears to have created a subliminal association in the minds of consumers. Such an association is particularly relevant in cases involving common symbols because "advertising and trademarks rely on impressions. The consumer does not memorize the mark. He has a feeling about it from past exposure." *Londontown Manufacturing Co. v. Cable Raincoat Co., supra*, 371 F.Supp. at 1118. Since the Bank's "Edge" campaign was designed to create a similar subliminal association with a lion, it is likely to be confused with the Dreyfus lion and to dilute the existing association of such lions with Dreyfus. Subliminal confusion harms a senior user by permitting the alleged infringer to "gain a foothold in its market by exploiting subliminal or conscious association with [the plaintiff] . . . ." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., supra*, 486 F.Supp. at 428.

Even assuming the accuracy of all defendant's contentions regarding confusion, plaintiffs nevertheless have raised a substantial federal claim based upon dilution, given the circumstances of this case. The federal courts have refused to recognize a cause of action under the Lanham Act for dilution caused by an otherwise infringing use in connection with noncompeting goods so unrelated to those of the senior owner that there can be no likelihood or prospect of confusion of any kind. *See, e. g., Avon Shoe Co. v. David Crystal, Inc.*, 279 F.2d 607 (2d Cir. 1960); *G.B. Kent & Sons, Ltd. v. P. Lorillard Co.*, 114 F.Supp. 621 (S.D.N.Y.1953), *aff'd on opinion below*, 210 F.2d 953 (2d Cir. 1954). *See generally* 3 Callman, *supra*, § 84.2, at 953–64; Note, *Dilution: Trademark Infringement or Will-O'-the-Wisp?* 77 Harv.L.Rev. 520 (1964). That refusal may well be overstated by some, and in any event appears to be based upon unwarranted premises about the importance of dilution and its conceptual severability from the concept of confusion, as well as upon an excessively narrow reading of the legislative history of the Lanham Act. 3 Callman, *supra*, § 84.2, at 959; Derenberg, *The Problem of Trademark Dilution and the Antidilution Statutes*, 44 Calif. L.Rev. 439 (1956); *see* Schechter, *The Rational Basis of Trademark Protection*, 40 Harv.L.Rev. 813 (1927); Wolff, *Non-Competing Goods in Trade Mark Law*, 37 Colum. L.Rev. 582, 602 (1937). Nevertheless, the federal courts seem ready at this point to protect a senior user of a suggestive mark from potentially serious harm caused by dilution, where the alleged infringer's use is in connection with noncompeting goods that are related to the senior user's goods.

Harm from dilution is caused when a mark loses its advertising value, because its distinctiveness in the minds of consumers is undermined. Distinctiveness is valuable to the trademark owner because it identifies his product to consumers both effectively and positively. The Dreyfus lion, for example, is a potent symbol that identifies the Dreyfus companies in the minds of consumers with the service advertised, and that allegedly leads consumers to think positively about Dreyfus, because of the "affirmative associations" consumers have both with lions (nobility, strength, leadership etc.) and with Dreyfus itself as a result of its perceived performance as a leader in money management. *See* Note, *supra*, 77 Harv.L. Rev. at 531. The mark is diluted when consumers see lions that they initially associate with Dreyfus, but that they subsequently realize are being used to advertise some other product or enterprise. Any consumer so exposed will thereafter less readily identify realistic lions in financially oriented ads with Dreyfus. If still other financial products and enterprises are advertised with lions, the mark may entirely lose its value to Dreyfus as an identifying device, and to the extent the new uses of lions

cause negative associations among consumers between similar lions and the products or enterprises they are used to advertise, the Dreyfus mark will lose its value as a device for evoking positive associations.

In theory, one could argue that the Dreyfus marks could be diluted even by a use that creates no confusion whatever. But in reality, the Dreyfus marks' distinctiveness—whatever might be said of other marks—is limited to the area of financial management, and to lions of the type used in Dreyfus ads. The MGM lion, for example, might dilute the Dreyfus mark, and vice versa. Yet the dilution that could be expected to flow from these coexisting uses is insubstantial, because of the absence of significant confusion; no protection would therefore seem proper for either user, under any theory of relief. Dilution of the Dreyfus marks would appear substantial enough to warrant protection only when the second user's advertising is similar to, and in a field closely related to, Dreyfus' advertising or product market. The junior user may not compete with Dreyfus, and it may even be assumed that neither user is likely to bridge the gap between them and begin to compete directly. Nevertheless, where the commercials are closely similar to those used by Dreyfus, and the copying is by a company in a related field, a possibility of substantial dilution is present, which is in fact the product of a form of confusion, albeit among noncompeting goods. Under these circumstances, Dreyfus may well deserve protection, even if one assumes that not all dilution caused by noncompetitive advertising should be actionable under the Lanham Act. *See generally* Callman, *supra*, § 82.2(c).

In this case, it is unnecessary now to decide whether a claim of substantial dilution caused by similar advertising of noncompeting services in related fields would definitely be sufficient under the Lanham Act. The parties have not yet briefed or argued the issue. But the argument presents an additional issue sufficient in itself to warrant granting preliminary relief, if the balance of hardship tips in plaintiffs' favor.

For the foregoing reasons, Dreyfus is likely to succeed on the merits with respect to similar advertising, intentionally utilized by the Bank, and aimed at the financial market within the United States; at the least, Dreyfus has succeeded in raising substantial questions going to the merits.

III. *Balancing the Hardships*

The defendant argues that a preliminary injunction will cause the Bank a substantial loss of time, money, and advertising inertia. This is no doubt true in principle, but defendant's evidence on the extent of its losses is vague and inconclusive. The "Edge" campaign took several months to develop, at a cost of $1,000,000. It is a worldwide campaign, however, as a Royal Bank executive testified, ongoing in other nations at this time. The Bank has not specified what portion of its campaign costs has been spent on the United States and what portion on the rest of the world. An injunction limited to the offending ads, within the United States, would not prevent the campaign from continuing even in this country with modified advertising, utilizing other symbols including nonrealistic lions. Even assuming that the amount of money that may be lost because of an injunction is substantial, the Bank is a vast company to which the level of expenditure undertaken is far less significant than to the average company. Furthermore, the "Edge" campaign is replaceable. Royal Bank's Senior Vice President of Public Affairs testified that it had an alternative plan "waiting on the shelf" that could be launched in approximately eight weeks. Tr. 145. Finally, to the extent a suspension or replacement imposes costs or creates hardship for the Bank, these consequences are the product of its deliberate decision to initiate the imitative advertisements, a factor that tempers one's sympathy for any resulting hardship.

█ The potential hardship faced by Dreyfus if the Bank's campaign continues are substantial. Dreyfus has spent over $33 million in the past decade alone to make the lion symbol a familiar mark, far more than the Bank has yet expended. It has spent

virtually that entire amount in this country. Its mark appears to remain strong, despite the particular forms of its recent advertising. It has underway and is planning new advertising campaigns, moreover, utilizing more heavily the forms of its earlier advertising program. If its lion mark is diluted in the financial market, the cost of reaching consumers effectively would be greatly increased. Given the dynamic nature of business enterprise, Dreyfus may well be irreparably harmed if its mark is diluted even by a temporary campaign of the size and purpose contemplated by the Royal Bank. Finally, Dreyfus' failure to enforce its mark against sporadic, isolated, lion ads, appearing in foreign and/or specialized periodicals, cannot reasonably be said to justify or excuse the Bank's campaign. The balance of hardships tips decidedly in plaintiffs' favor.

## IV. *Dreyfus' State Claims*

Dreyfus also claims that the Royal Bank has violated the New York anti-dilution statute, N.Y. Gen. Business Law § 368–d (McKinney), which reads:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, not withstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

New York's anti-dilution law is designed to protect the distinctiveness of an owner's trademark from being undercut by another's similar use. *Mortellito v. Nina of Calif., Inc.*, 335 F.Supp. 1288, 1296 (S.D.N.Y. 1972); *King Research, Inc. v. Shulton, Inc.*, 324 F.Supp. 631, 638–39 (S.D.N.Y.1971). The findings and conclusions reached with respect to the trademark cause of action make it highly likely that the New York statute has been violated. If anything, the likelihood of a violation of § 368–d is greater than of the Lanham Act.

To establish a cause of action under § 368–d the plaintiff need not prove the existence of any competition with the defendant. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 369 N.E.2d 1162, 399 N.Y.S.2d 628 (1977); *Peerless Electric Co. v. Peerless Electric, Inc.*, 206 Misc. 965, 135 N.Y.S.2d 885 (Sup. Ct., N.Y. County 1954). Therefore, to the extent that the Bank has shown that no competition exists between the parties to this action, that fact has no adverse bearing upon plaintiffs' claims under § 368–d. Furthermore, substantial authority supports the view that a finding of a likelihood of confusion is not essential to a cause of action under § 368–d. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* supra, 604 F.2d at 205 n.8; *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 49 (2d Cir. 1978); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* supra, 42 N.Y.2d at 544–45, 369 N.E.2d at 1165–66, 399 N.Y.S.2d at 632. While some federal courts have resisted this development, no court has suggested that New York law would not protect the substantial dilution of a strong mark brought about by defendant's use of the mark with intent to exploit its favorable impression and associations in the owner's general field of commerce. *Compare Information Clearing House, Inc. v. Find Magazine,* 492 F.Supp. 147, 162 & n.44 (S.D.N.Y.1980) (citing *Exquisite Form Indus. Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 415 (S.D.N.Y.1974)). *See generally* Note, *supra,* 77 Harv.L.Rev. at 527–28; 46 Fordham L.Rev. 1315, 1326–28 (1977–78); *King Research, Inc. v. Shulton, Inc.,* 324 F.Supp. 631, 638–39 (S.D.N.Y. 1971), *aff'd,* 454 F.2d 66 (2d Cir. 1972) (criticizing reluctance to enforce statute). Though Dreyfus' lion marks are not so unique and arbitrary as to deserve protection in fields totally unrelated to Dreyfus' activities, it is a suggestive use that has acquired great strength in the financial arena. The statute should not be read to deprive marks from protection against dilution in limited areas of use, since otherwise it would afford protection only to the most notorious of all marks.

Plaintiffs' motion for a preliminary injunction is granted. Defendant is prelimi-

narily enjoined from utilizing lions such as those used by Dreyfus, in any advertising with significant exposure in the United States. Plaintiff will submit a proposed order on notice.

SO ORDERED.