**JORDACHE ENTERPRISES, INC., Plaintiff,**

v.

**LEVI STRAUSS & CO., Defendant.**

**No. 91 Civ. 3704(SWK).**

United States District Court, S.D. New York.

Dec. 20, 1993.

508

Robert A. Spiegelman, New York City and Blank Rome Comisky & McCauley, Philadelphia, PA by Arnold I. Kalman, for plaintiff.

Paul, Hastings, Janofsky & Walker, New York City by Samuel D. Rosen, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this action involving two nationally known manufacturers and distributors of jeans and jeans apparel, plaintiff Jordache Enterprises, Inc. ("Jordache") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment against Levi Strauss & Co. ("Levi"). Specifically, Jordache seeks an order declaring that its use of the trademark "Jordache Basics 101" [1]

1. The parties disagree as to the precise trademarks at issue. At oral argument, held on July

(1) is not likely to cause the public to be confused that jeans and jeans apparel sold in association with that mark are manufactured or are otherwise sponsored by Levi, and such use therefore does not infringe any rights Levi may have in the mark "501" under §§ 32(1) and 43(a) of the Federal Trademark Act (the "Lanham Act"), 15 U.S.C. §§ 1114(1), 1125(a), and the common law of unfair competition; (2) does not constitute a false designation of the origin or affiliation, or a false description or representation of characteristics and qualities of such jeans under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the common law of unfair competition; (3) does not cause an impairment of or a reduction in the distinctiveness of Levi's "501" trademark, pursuant to section 368-d of the New York General Business Law; and (4) does not otherwise appropriate any advertising value associated with Levi's "501" mark under the common law of unfair competition. Jordache also moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Levi's counterclaims.

Levi opposes Jordache's motions and cross-moves for summary judgment on its counterclaims, alleging that Jordache's use of the mark "Jordache Basics 101" and design: (1) is likely to cause confusion, mistake or deception and constitutes infringement of Levi's "501" mark in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) constitutes a false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) dilutes the distinctive quality of the "501" trademark and Levi's family of three-digit marks in violation of New York's antidilution statute, N.Y.Gen.

Bus.Law § 368-d; and (4) misappropriates Levi's advertising and promotional expenditures, and the goodwill and advertising value inherent in Levi's "501" mark and other three-digit marks, in violation of the law of unfair competition. Alternatively, Levi moves for a preliminary injunction halting Jordache's use of its allegedly infringing "101" mark until trial.

## BACKGROUND [2]

### I. Jordache

Except where noted, the following facts are undisputed. Jordache is a nationally-known manufacturer and distributor of jeans and jeans apparel, and has sold such products in conjunction with the federally registered "Jordache" trademark since 1978.[3] In 1986, Jordache began using the "Jordache Basics" trademark in the manufacture, sale, promotion, and advertisement of its jeans and jeans apparel. In 1988, it also commenced use of the trademark "Jordache Basics 101."[4] During this same time period, Jordache ran a television commercial that Levi claims to be a simulation of the style, format and mood of Levi's "501 Blues" advertising campaign.

Subsequently, beginning in February 1991, Jordache used "Jordache Basics 101 with wings and stars design" in commercial advertisements to promote a line of Jordache jeans. These advertisements appeared in magazines such as *Mademoiselle, Seventeen, Cosmopolitan* and *Redbook,* as well as on approximately 320 outdoor promotional displays at bus shelters in New York City, Los Angeles and San Francisco. In addition, an

16, 1993 ("Oral Argument"), Jordache confirmed that it is seeking declaratory judgment only with respect to its "Jordache Basics 101 with wings and stars design" mark. *See* transcript of Oral Argument ("Oral Arg. Tr.") at 7–8. As Jordache has stated that it does not intend to use the "101" mark other than as part of its "Jordache Basics 101" trademark, the Court need not consider whether the use of "101" alone (or "Jordache 101" or "Basics 101") infringes or dilutes Levi's "501" trademark. Hereinafter, the mark "Jordache Basics 101" shall be referred to by its full name, or as the "'101' mark."

2. The following facts are taken from the parties' statements pursuant to Local Rule 3(g), the mov-

ing papers, affidavits and declarations submitted by both parties, and Oral Argument.

3. Levi claims that Jordache is not known nationally for the distribution and sale of men's jeans. See Defendant Levi Strauss & Co.'s Consolidated Rule 3(g) Statement in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross–Motion for Summary Judgment ("Levi's Rule 3(g) Statement"), at ¶ 1.

4. Levi claims that Jordache has made only token, sporadic use of the designation "101," and that such use does not entitle Jordache to any trademark rights in that designation. See Levi's Rule 3(g) Statement at ¶ 3.

advertisement incorporating the mark "Jordache Basics 101 with wings design" appeared in the September 15, 1991 men's fashion supplement of *The New York Times Magazine*. Between November 25, 1991 and January 19, 1992, Jordache also sponsored television commercial advertisements featuring the "Jordache Basics" and "101" marks. Subsequently, from February 1992, through May 1992, and again in July 1992, Jordache placed advertisements using the "Jordache Basics 101" mark in *The New York Times Magazine, Glamour, Mademoiselle, Seventeen, Cosmopolitan, Rolling Stone, Vogue* and *Playboy*.[5]

Between October 1990 and February 1991, Jordache manufactured and distributed approximately 600 dozen men's jeans that were promoted as "Jordache Basics 101 with wings and stars designs" and "Jordache 101 with wings and stars designs." Most of these jeans were sold in early 1991 to several small retailers, not including any department stores or large specialty chains. An additional 200 dozen jeans were ordered for distribution and sale in the fall of 1991 and the winter of 1992, and 1,000 dozen "Jordache Basics 101" jeans were ordered for production and shipment through September 15, 1992. These jeans were labelled, affixed and tagged with the following Jordache identifiers: (1) either the "Jordache Basics," "Jordache Basics 101 with stars and wing designs" or "Jordache 101 with stars and wing designs," trademark was printed on suedelike fabric which was permanently stitched onto the jeans at the top of the right rear panel and positioned between two belt loops; (2) the trademark, "Jordache," was stitched in thread to a strip of fabric and placed on one of the rear pockets; (3) metal rivet fasteners and buttons were embossed with the mark, "Jordache;" (4) Jordache's "Horsehead Design" trademark was placed on a permanent inside tag on which was printed the jean's size and care instruction information; (5) the "Horsehead Design" also appeared on the zipper pull; and (6) bright colored, detachable "flasher cards" bearing one of the trademarks, "Jordache Basics," "Jordache Basics 101 with wings and stars designs" or "Jordache 101 with wings and stars designs," was attached to the jeans at the point-of-sale.[6] The entire line of Jordache jeans featured a front zipper fly.

Jordache describes its "101" products as "high waisted, tight body fitting, zipper-front jean[s]." *See* Deposition of Stephen Baum, taken on July 30, 1991, at 331, annexed to Plaintiff's Statement of Material and Undisputed Facts Pursuant to Local Civil Rule 3(g) ("Jordache's Rule 3(g) Statement"), as Exh. "7." According to Jordache, the "Jordache Basics 101" style is intended for the woman or man who desires their jeans to have a "tight sexy fit." *See* Deposition of David Warren, taken on August 2, 1991, at 82, annexed to Jordache's Rule 3(g) Statement as Exh. "4."[7] Jordache jeans for men are priced between $30.00 and $45.00.

Jordache claims that its "Jordache Basics 101" mark forms an integral part of its campaign of advertising and marketing promotion, generating future consumer demand even though the product is not immediately available. According to Jordache, the "Jordache Basics 101" concept directs the consumer to a line of basic, five pocket, western-style jeans, by communicating the idea that "like the first course one can take in school in any subject, 'there is nothing more basic than

---

5. Levi argues that Jordache's advertisements of "101" have not caused consumers to recognize "101" as a trademark for jeans, and that most of the promotions fail to convey any message that such advertising is even for jeans. *See* Levi's Rule 3(g) Statement at ¶ 3.

6. Levi contends that, although these jeans contained the designation "Jordache," this designation was not the predominant feature of the marks appearing on the jeans and jean labels. *See* Levi's Rule 3(g) Statement at ¶ 6.

7. Jordache contends further that the jeans associated with the "Jordache Basics 101" campaign have a completely different style, cut, fit and silhouette from jeans associated with the Levi "501" trademark. Specifically, Jordache maintains that its jean is a "high-waisted, tight body fitting, zipper-front jean," whereas the Levi jean is a "low rise, loose fitting jean." Levi claims, however, that Jordache jeans are not completely different from "501" jeans as both jeans (1) are five pocket, traditional blue jeans; and (2) "501" jeans can be tight fitting and have been advertised as such, *i.e.*, as "shrink to fit" jeans. *See* Levi's Rule 3(g) Statement at ¶ 10.

101 in the Jordache line' of jeans apparel." *See* Jordache's Rule 3(g) Statement at ¶5.

## II. Levi Strauss

Levi originated its line of "501" jeans in the 1800's, when the model number 501 was randomly assigned to a style of jeans containing five pockets, a button fly, and metal rivets securing the edges of each pocket. In 1969, Levi officially began use of the number "501," a federally registered mark, as a trademark for the jeans themselves.[8] The style of jeans utilizing the "501" trademark has remained virtually unchanged for over 135 years and, Levi's "501" jeans have frequently been referred to as the "original" jeans.

Levi's "501" jeans can be purchased either in pre-shrunk, or original non-pre-shrunk, or "shrink-to-fit," forms. Thus, in contrast to Jordache's description of "501" jeans as "loose fitting," Levi claims that its "501" jeans, after washing, provide a fit that conforms to the body. Levi's "501" jeans are available in various fabric treatments, such as stonewashed (rocks), stonewashed (chemical), rinsed, bleached, white-washed, electric-washed, and overdyed. The "501" jean is tagged with several Levi identifiers, including: (1) the "arcuate" design pattern identifier, which is stitched on the two rear pockets; and (2) a permanent red ribbon labelled "Levi," which is sewn on the jean's left-hand vertical seam of the right rear patch pocket; (3) the "Guarantee Ticket," consisting of a leather-like fabric which is sewn on the waistband; (4) a flash card prominently displaying the "501" mark; and (5) a button fly. Generally, "501" jeans are sold at retail prices ranging from $16.99 to $42.00.

In the period 1982–1991, Levi expended over $150,000,000 in advertising that featured the "501" mark. This advertising was conducted via television, posters, print and in-store displays, and is considered the largest advertising program ever conducted for a specific apparel item. Levi "501" jeans have also received extensive publicity in the news media. In the period 1970–1991, Levi sold more than 390 million pairs of "501" jeans, yielding more than $5 billion in revenues.

While "501" jeans are targeted for men, in 1981, Levi introduced a special line of "501" jeans for women. Additionally, since 1987, Levis has produced, advertised and sold a line of women's jeans identified by three-digit trademarks in the "900" series. Sales of the "900" series models have exceeded $185 million though 1991. The most popular model in this line is the "901" jean, with sales of over 2.7 million pairs, producing revenue of more than $41 million. A youthwear version of "501" jeans was also introduced in 1905. Sales of these jeans between 1970–1991 exceeded $570 million. In conjunction with the "501" trademark that appears on the flashcard attached to the rear pocket of these jeans, the designation "701" appears on the leather patch which is permanently affixed to the garment.

In addition to its jeans utilizing the "501," "701" and "901" trademarks, Levi offers several different styles of jeans utilizing other three-digit trademarks in the 500 series, including "505," "506," "517," and "550." The "505" and "517" marks are federally registered. Levi claims that its marketing strategy has been to attract vast purchaser interest in "501," creating a promotional halo over its other jeans styles. As with its "501," "701" and "901" jeans, Levi has enjoyed large sales of jeans bearing its other three-digit marks. For example, in the period 1989–1990, sales of the "505," "506," and "517" and "550" jeans exceeded 95 million units and amounted to more than $1.5 billion in revenues.

## III. Registration of Jordache Trademarks

Between February and April 1988, Jordache applied to register with the United States Patent and Trademark Office ("PTO") the trademarks "Jordache 101," "Jordache Basics 101," and "Basics 101." In the latter part of 1988, Levi filed notices of opposition to each of these marks, claiming that Jor-

---

8. Although Jordache claims that Levi's trademark is actually "Levi's 501," and trademark rights in "the number [have been] disclaimed," *see* Statutory Declaration of Levi Strauss before the Italian trademark office, annexed to Jor-

dache's Rule 3(g) Statement as Exh. "22," Levi confirmed at Oral Argument that the registered mark is, indeed, the number "501" alone. *See* Oral Arg. Tr. at 15; *see also* Jordache's Rule 3(g) Statement at ¶12; Def. Br. at 5.

dache's use of the number "101" was similar to Levi's family of three-digit trademarks, and therefore likely to confuse or mislead the public into believing that Jordache's jeans either originated from, were associated with, or were sponsored by Levi. Subsequently, in October 1989, Jordache abandoned its application to register those trademarks. Jordache claims, however, that it reserved the right "to use trademarks including the numeral '101' in different formats and/or different design configurations." *See* letter from Lori B. Cohen, counsel for Jordache, to Milton W. Schlemmer, counsel for Levi of 12/28/89, annexed to Jordache's Rule 3(g) Statement as Exh. "30."

On February 1, 1991, Jordache filed an intent to use application with the PTO to register the mark "Jordache Basics 101 with star and wing design" for use with jeans and jean apparel. Levi opposed Jordache's application and the opposition was suspended without decision pending the outcome of the instant action.

### IV. The Parties' Claims and Counterclaims

On June 17, 1991, Jordache filed an amended complaint, seeking declaratory judgment that (1) its use of the mark "Jordache Basics 101" does not violate Levi's rights in the mark "501" under either §§ 32(1) and 43(a) of the Lanham Act, or the common law of unfair competition; (2) Jordache has the right to continue using the mark "Jordache Basics 101" free from interference by Levi; (3) its use of the "Jordache Basics 101" mark does not dilute and violate Levi's rights in the "501" mark under N.Y.Gen.Bus.Law § 368–d. Jordache also seeks an order preliminarily and permanently enjoining Levi from interfering with, or threatening to interfere with Jordache's use of the mark "Jordache Basics 101," and instituting any suit or other proceeding placing in issue Jordache's right to use this mark.

Levi answered the amended complaint on June 24, 1991, and asserted four counterclaims against Jordache. Specifically, Levi alleges that Jordache's use of the "Jordache Basics 101" mark: (1) is likely to cause confusion, mistake or deception and constitutes an infringement of Levi's registered "501"

mark in violation of § 32(1) of the Lanham Act (Count One); (2) constitutes a false designation of origin or affiliation and a false description or representation of the characteristics and qualities of its products in violation of § 43(a) of the Lanham Act (Count Two); (3) dilutes the distinctive quality of the "501" trademark and Levi's other three-digit marks in violation of the antidilution statute set forth in N.Y.Gen.Bus.Law § 368–d (Count Three); and (4) misappropriates Levi's advertising and promotional expenditures and the goodwill and advertising value inherent in Levi's marks in violation of the law of unfair competition (Count Four).

## DISCUSSION

### I. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin,* 841 F.2d 48, 50 (2d Cir.1988); *Knight v. United States Fire Ins.*

*Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the Court must inquire whether "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the non-movant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *see Knight v. United States Fire Ins. Co.,* 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the non-moving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the non-movant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

Once the non-moving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to establish his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett,* 477 U.S. at 330, n. 2, 106 S.Ct. at 2556, n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct.

1575, 1593, 20 L.Ed.2d 569 (1969)); *see also Weg v. Macchiarola,* 654 F.Supp. 1189, 1191–92 (S.D.N.Y.1987).

## II. Trademark Infringement

### A. Likelihood of Confusion

The Lanham Act prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" where "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). It also holds liable any person who uses in commerce any symbol which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a). To state a claim for trademark infringement or unfair competition, a party must show a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256 (2d Cir.1987) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)).[9]

Actionable confusion is not limited to cases in which the infringer purposely attempts to pass off his product as that of the competitor. Rather, the Lanham Act "outlaw[s] the use of trademarks which are likely to cause confusion, mistake or deception of any kind, not merely of purchasers nor simply as to source of origin." *Syntex Labs., Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 568 (2d Cir.1971). Types of confusion that constitute trademark infringement include where: (1) prospective purchasers believe that the senior user sponsored or otherwise approved of the junior user's trademark, *see Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979); (2) potential consumers initially are attracted to the junior user's

---

9. The same test is to be applied when analyzing a claim for unfair competition and a claim for trademark infringement under the Lanham Act.

*See Marshak v. Sheppard,* 666 F.Supp. 590, 602 (S.D.N.Y.1987).

mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase, *see Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir.1975); and (3) customers are confused as to the source of the junior user's product when this product is observed in the post-sale context, *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986).

 In deciding the issue of likelihood of confusion, the Court is guided by the multi-factor test set forth by Judge Friendly in the classic case, *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir.1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The so-called *"Polaroid* factors" for determining whether likelihood of confusion exists consist of eight criteria: (1) strength of the mark; (2) degree of similarity between the two marks; (3) proximity of the products; (4) likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) defendant's good faith; (7) quality of defendant's product; and (8) sophistication of buyers.[10] *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d at 495. Questions regarding the likelihood of confusion normally are factual in nature. *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 116 (2d Cir. 1984). Nevertheless, " 'courts retain an important authority to monitor the outer limits of substantial similarity within which the jury is permitted to make the factual determination whether there is a likelihood of confusion as to source,' and summary judgment is appropriate if the court is satisfied that the products or marks are so dissimilar that no question of fact is presented." *Id.* (quoting *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir.1983)). As "each [Polaroid] factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product," *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d at 872, the Court will examine each factor in turn.

### 1. Strength of the Mark

 The first factor—strength of the mark—weighs heavily in Levi's favor. The strength of a mark has been defined as "its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1132 (2d Cir.1979). The relative strength of a mark is measured by its conceptual strength along the spectrum of marks, as well as by its significance in the marketplace. *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1554 (S.D.N.Y.1987). Ultimately, the strength of a mark is a function "of its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d at 1132.

 Marks are classified in the following categories of increasing distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Arbitrary and fanciful marks are, by their nature, stronger marks because they are identified solely with a particular product or service. *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1274 (S.D.N.Y.1986). "When these marks are registered, they are accorded the highest degree of protection." *Id.*

It is undisputed that the "501" mark is arbitrary and fanciful. Arbitrary marks consist of words that neither suggest nor describe any characteristic of the particular good or service with which it is used. *See Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. at 1554. As the ordinary meaning of the numeral "501" does not describe any particular quality or characteristic of jeans or jean apparel, the "501" trademark is conceptually strong when applied to such products. Moreover, it is evident that the

---

**10.** The Court notes that the eight *Polaroid* factors for resolving likelihood of confusion are nonexclusive, and that other factors may also be considered. *See Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 536 (2d Cir. 1964); *see also Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir.1988).

"501" mark has developed a powerful secondary meaning as, standing alone, it serves to identify Levi as the source of the jeans.

Additionally, the commercial strength of the "501" mark attests to its significance in the marketplace as identifying the source of the goods. Levi's massive advertising efforts, the length of time during which the "501" mark has been used to describe Levi products, Levi's aggressive promotion of the "501" mark and the extent of unsolicited media coverage enjoyed by Levi's "501" jeans further enhance the mark's distinctiveness. Accordingly, the Court finds that Levi has established the strength of the "501" mark as a matter of law.[11]

### 2. Degree of Similarity

■ The second *Polaroid* factor the Court must examine is the similarity of the two marks. In determining whether the two marks are similar, the Court must look to the effect on prospective purchasers. Thus, " 'similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question.' " *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d at 1133 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 82.1(a), at 601–02 (3d ed. 1969)); *see also Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1226 (2d Cir.1987) (stating that the general impression conveyed to the purchasing public is the pertinent inquiry). "The test is not whether the consumer will know the difference if he sees the competing products on the same shelf. Rather, it is whether he will know the difference if the junior mark is singly presented and he has heard of the senior mark." *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. at 1555.

The parties hotly dispute whether the Levi and Jordache marks are similar. Levi contends that Jordache's method of labeling its "101" jeans, as well as its advertising campaigns greatly increase the likelihood that prospective purchasers will be confused. Conversely, Jordache contends that there is no likelihood of confusion because of the actual and specific use that Jordache makes of the numeral "101." The Court finds that the degree of similarity between the two marks is a disputed issue of fact upon which reasonable minds may differ.

First, the Court acknowledges that the number "101" is extremely close to "501." This disturbing similarity stems not only from the fact that both marks consist of three digit numbers, but also from the fact that only one digit is changed and the numbers sound alike when spoken. Furthermore, because Levi uses other three-digit marks, such as "701" and "901" in the marketplace, Jordache's "101" mark creates the impression that it is yet another item in Levi's pre-existing "01" series, and substantially increases the likelihood of confusion.

■ Nevertheless, "[t]he fact that a trademark is always used in conjunction with a company name may be considered by the trial court as bearing on the likelihood of confusion." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d at 1134. Jordache confirmed at Oral Argument that it does not intend to use the numeral "101" standing alone, but rather, as part of the trademark "Jordache Basics 101 with wings and stars design." This mark, attaching the Jordache identifier to the numeral, is substantially less similar to Levi's "501" mark, and thus, substantially less likely to cause confusion. Accordingly, as this factor creates a factual dispute, summary judgment is precluded as a matter of law.[12]

---

11. Jordache sets forth approximately 164 instances in which third parties have registered three-digit numerals as trademarks for jeans or other apparel. While the Court notes that the weakness of a mark may be shown by evidence of the use or promotion of the same mark by third parties, "[m]ere registrations, by themselves, prove neither actual use of any of the marks registered by competitors, nor the degree of competitors' promotion of their marks through advertising." *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. at 1274.

12. Jordache cites to evidence that certain foreign trademark offices have held that the mark "Jordache 101 Uses" is not confusingly similar to the Levi "501" mark as indicative that the marks at issue here are, in fact, dissimilar. The Court finds, however, that decisions of foreign tribunals concerning the trademark rights of parties is irrelevant. *See E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1532 (11th Cir.1985) (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir.),

### 3. Proximity of the Products

■ The third *Polaroid* factor addresses whether, due to the proximity of the competitive products in the marketplace, consumers may be confused as to their source. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d at 77. Factors to consider in determining the competitive proximity of the products include appearance, style, function, fashion appeal, advertising orientation and price. *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d at 1134. "Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity," creating a strong likelihood of confusion. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d at 77.

As an initial matter, the Court notes that Jordache and Levi manufacture and sell a similar product. As the Second Circuit stated in a trademark infringement case involving Levi and another jeans manufacturer, *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d at 870, "[w]hile stratifying the jeans market with various styles and grades seems to be the current rage, there can be no dispute that the parties before us compete to sell their jeans to the public."

Jordache points to the different style, cut and fit between its product and Levi's jeans, and contends that the two companies target different consumers. While Jordache identifies these differences in style and cut, however, it ultimately concedes that the markets are proximate. *See* Pl. Br. at 17. Levi argues further that the prices of the products are within the same range, and that the two jeans models at issue contain five pockets and riveted pocket corners. While the Court acknowledges that Jordache and Levi compete in the same general market, whether the companies, in fact, target slightly different consumers of jeans is an issue of fact for trial.

■ In any event, should a jury determine that Jordache and Levi do, indeed, compete for slightly different consumers in the jeans market, the third *Polaroid* factor favors Levi. As this Court has held, there is

*cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956)); *Grotrian, Helfferich, Schulz, Th. Ste-*

an even greater likelihood of confusion where the junior user's product competes for a slightly different market segment than the senior user. Thus, a consumer observing Jordache's mark

> might assume that [Levi] had chosen to enter that market segment using a subsidiary corporation, or that [Levi] had allowed [Jordache's] designers to use [the "101" mark] as a means of reaping some profits from the designer jeans fad without a full commitment to that market segment. Likewise, in the post-sale context a consumer seeing [Jordache's] jeans on a passer-by might think that the jeans were [Levi's] long-awaited entry into the designer jeans market segment. Motivated by this mistaken notion—[Levi's] goodwill— the consumer might then buy [Jordache's] jeans even after discovering his error. After all, the way the jeans look is a primary consideration to most designer jeans buyers.

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d at 874. Accordingly, the Court finds that the third *Polaroid* factor favors Levi.

### 4. Likelihood that Levi Will Bridge the Gap

■ The fourth *Polaroid* factor seeks to protect the senior user's interest in being able to enter a related field at some future time. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d at 874. If the owner of a trademark can show that it intends to enter the market of the alleged infringer, such a showing is indicative of future likelihood of confusion as to source. *Id.* The more closely the products compete, the shorter the gap is to bridge. *Andy Warhol Enters., Inc. v. Time Inc.,* 700 F.Supp. 760, 766 (S.D.N.Y.1988).

As set forth in Part 3, *supra,* while Jordache and Levi are competing in the jeans market, it is unclear whether the two companies address different segments of purchasers. Accordingly, whether Levi is likely to bridge the gap is also a question of fact.

*inweg Nachf. v. Steinway & Sons,* 523 F.2d at 1337.

## 5. Actual Confusion

■ The fifth factor looks to whether any consumers have actually been confused by the products bearing the allegedly confusing marks. *See Centaur Communications v. A/S/M Communications,* 830 F.2d at 1227. Evidence of actual confusion consists of (1) anecdotal evidence of confused consumers in the marketplace; and (2) consumer survey evidence. *Id.*

Levi concedes that it does not have any anecdotal evidence of actual instances of confusion. It argues, however, that anecdotal evidence of actual confusion is unlikely here as Jordache's total production of jeans bearing the "101" mark is so insignificant. As Jordache clearly has not infiltrated the market with products bearing the "101" trademark, the Court will not make any negative inference from the fact that Levi has not shown any anecdotal evidence of actual confusion. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d at 78 (finding that lack of actual confusion does not warrant an inference against the senior user in light of the short time in which the junior user's product was on the market).

In addition, the Court finds the survey evidence offered by Levi as evidence of actual confusion to be inconclusive. In 1992, Levi commissioned a consumer-mall intercept survey for the purpose of ascertaining the existence and level of dilution of the Levi "501" mark by Jordache's use of the "101" mark.[13] Levi maintains that, although the Sorenson Survey was designed to measure dilution, it also yielded evidence of confusion.[14]

According to the survey data, when asked whether they had seen or heard of jeans having the number "101" on them, 17.7 percent of the respondents replied that they had seen those jeans before. Of this group, 29.2 percent (5.2 percent of total participants) responded that they had seen the jeans in advertising, 59.4 percent responded that they had seen the jeans in stores (10.5 percent of total participants) and 11.4 percent (2.0 percent of total participants) responded that they had seen them being worn by others.

■ Jordache contends that the Sorenson Survey is flawed because it did not occur under marketplace conditions, and survey participants did not have a present interest in purchasing jeans. After examining the Sorenson Survey, the Court finds, as a threshold matter, that the survey's universe was defective, rendering the data irrelevant for purposes of demonstrating actual confusion. While a survey may indicate likelihood of confusion, it must " 'have been fairly prepared and its results directed to the relevant issues.' " *Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d at 118 (quoting *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651, 657 (W.D.Wash.1982)). While the Court agrees with Levi that the mall-intercept format of the Sorenson Survey is acceptable, the Court finds that the survey did not properly set forth a legitimate universe of jeans buyers.

To be valid, a survey must rely on responses by potential customers of the products in question. *See id.* at 118; *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 660–661, n. 4 (2d Cir.1979) (holding that a survey was defective where survey participants, although former purchasers of the product at issue, did not necessarily have any present purchasing interest in the particular matter being surveyed), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); *Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1116 (S.D.N.Y. 1981). While the Sorenson Survey inter-

---

13. *See* Robert C. Sorenson, Source and Brand Reminders of Jordache "101" Jeans: A Consumer Survey in Four U.S. Metropolitan Areas" (March 1992) ("Sorenson Survey"), annexed to the declaration of Dr. Robert C. Sorenson in Support of Levi Strauss' Motion for Summary Judgment or, Alternatively, for a Preliminary Injunction, dated August 3, 1992, as Exh. "B."

14. The survey consisted of interviews with 600 males who had purchased or worn jeans within the past six months in four metropolitan areas (Boston, Denver, Knoxville and Columbus). Each respondent was shown a pair of Jordache "101" jeans complete with all labelings that would appear on the jeans at the point-of-sale. The respondents were told to examine the jeans as though they were shopping for jeans, and were then asked if they had seen or heard of jeans having the number "101" on them.

viewed participants who had purchased or worn jeans within the past six months, it did not inquire as to whether those participants intended to purchase jeans in the future. *See* Deposition of Robert C. Sorenson, dated June 3, 1992, at 79–80, annexed to Jordache's Supplemental Rule 3(g) Statement as Exh. "41." As a result, the universe of respondents does not necessarily include potential purchasers of jeans. Accordingly, the Sorenson Survey does not constitute acceptable evidence of actual confusion.[15]

■ Nevertheless, the failure of Levi to offer valid survey evidence of confusion does not warrant the adverse inference that confusion is not likely. "[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d at 875. Moreover, while a showing of actual confusion may be probative, the absence of actual confusion is not probative. *Andy Warhol Enters., Inc. v. Time Inc.*, 700 F.Supp. 760, 766 (S.D.N.Y. 1988); *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F.Supp. 1185, 1201, n. 6 (S.D.N.Y.1979) (holding that no inference may be drawn against plaintiff for failure to offer evidence of a confusion survey, as the opportunity was available equally to defendant to commission and offer such a survey), *aff'd*, 636 F.2d 1203 (2d Cir.1980). Accord-

ingly, although the Court finds no evidence of actual confusion, this factor does not weigh in Jordache's favor as the "101" mark has not significantly infiltrated the marketplace for jeans.

### 6. Defendant's Good Faith

The sixth *Polaroid* factor examines the good faith of the junior user in selecting the mark. "Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir.1992).

The existence of good faith on the part of Jordache is disputed. Jordache contends that it selected the number "101" to evoke the image that, like the first course you take in any subject in school, "Jordache Basics 101" jeans are the most basic style of jeans in Jordache's line of apparel. Jordache argues further that it is a substantial company and is, therefore, relying on its own reputation and goodwill among consumers, and not on the reputation enjoyed by Levi. Levi claims, however, that the long history of Jordache's attempts to infringe on Levi trademarks[16] establishes Jordache's bad faith. Levi contends further that the fact that Jordache's television commercials are strikingly similar to Levi's advertising campaigns further establishes Jordache's bad faith. In the

---

**15.** The Court notes that, even if the Sorenson Survey had utilized an appropriate universe of respondents, the survey results do not lead necessarily to the conclusion that there is actual confusion in the marketplace. Levi contends that, as the Sorenson Survey was conducted in four cities in which "Jordache Basics 101" jeans were neither manufactured nor sold, the fact that 12.5 percent of the total respondents indicated that they had seen the Jordache product in stores or on other people shows that these respondents were, in fact, thinking of "501" jeans. However, the mere fact that 12.5 percent of respondents remembered seeing the Jordache product in stores or on others does not necessarily indicate that these respondents were confusing the Jordache jean with the Levi jean. Indeed, perhaps certain of these respondents had traveled to cities in which Jordache "101" jeans were sold and had the opportunity to view the jeans in stores or on others. Moreover, even if these respondents had never, in fact, had the opportunity to view Jordache "101" jeans, that does not mean that

they were confusing this product with Levi's product. The Sorenson Survey fails to ask any question attempting to establish any affiliation, association or sponsorship between Jordache and Levi.

**16.** Levi argues that Jordache previously attempted to infringe on three other Levi trademarks: the "arcuate" stitching design; the pocket tab mark; and the "guarantee ticket." *See* Declaration of Samuel D. Rosen in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Levi Strauss's Cross–Motion for Summary Judgment, or Alternatively, for a Preliminary Injunction, dated August 7, 1992 ("Rosen Dec."), at ¶ 3. Levi contends further that Jordache has imitated Levi's "501 Blues" television commercials, *id.*, and recently has launched an advertising campaign which employs the slogan "Zyp The Fly" in imitation of Levi's "Button Your Fly" advertising campaign. *See* Def. Reply at 3, n. 2.

face of this dispute, the Court finds that a conclusive determination regarding Jordache's intent must await trial.

### 7. Quality of Defendant's Product

■ The seventh *Polaroid* factor looks to the quality of the junior user's product. The parties apparently do not dispute that they both manufacture and distribute quality jeans and jeans apparel. Thus, Levi need not be concerned that the reputation associated with its mark is being tarnished by inferior merchandise. *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. at 1561. However, the fact that the goods are of corresponding quality actually "supports the inference that they emanate from the same source." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d at 1228; *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d at 875 (holding that the good quality of the alleged infringer's product actually may increase the likelihood of confusion as to source). Accordingly, the Court finds that the seventh factor favors Levi.

### 8. Sophistication of Buyers

■ The eighth factor, the sophistication of purchasers in the relevant market, "is grounded on the belief that unsophisticated consumers aggravate the likelihood of confusion." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d at 78. Thus, "[s]ophistication of consumers usually militates against a finding of a likelihood of confusion, though it might on occasion increase the likelihood of confusion, depending upon the circumstances of the market and the products." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d at 1228 (citations omitted).

The parties do not dispute that jeans purchasers are sophisticated consumers. Jordache claims that (1) jeans are an intensely personal item of clothing; (2) style, cut and fit play an important role in the consumer's selection and purchase of jeans; and (3) there exists strong brand loyalty among jeans purchasers. While Levi asserts that male purchasers do not spend a lot of time shopping, but, rather, look for particular visual cues in making quick purchase decisions,

Levi does not directly controvert Jordache's contention that jeans purchasers are sophisticated consumers. Indeed, Levi agrees that the typical jeans consumer looks to brand name and fit in purchasing jeans. *See* Deposition of Robert Kaplan, regional sales manager at Levi, dated July 18, 1991, at 95, annexed to Jordache's Rule 3(g) Statement as Exh. "11."

Nevertheless, the fact that jeans buyers are sophisticated consumers weighs in Levi's favor. Indeed, in a case involving two competing jeans manufacturers, the Second Circuit held that the sophistication of jeans buyers actually increased the likelihood that these consumers would be confused by jeans containing nearly identical back pocket stitching patterns. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d at 875. The *Lois Sportswear* court stated:

> [W]e believe that it is a sophisticated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattern on appellant's jeans indicates some sort of association between the two manufacturers. Presumably it is these sophisticated jeans buyers who pay the most attention to back pocket stitching patterns and their 'meanings.' Likewise in the post-sale context, the sophisticated buyer is more likely to be affected by the sight of appellee's stitching pattern on appellants' jeans and, consequently, to transfer goodwill.

*Id.* at 875–76 (citation omitted). Similarly, in this case, the fact that jeans purchasers are conscious of trademarks further increases the likelihood that the "101" mark will cause confusion as to the association between Jordache and Levi. Accordingly, the Court finds that the eighth factor favors Levi.

### 9. Summary

Although three of the *Polaroid* factors weigh in Levi's favor, namely, strength of the mark, quality of the junior user's product and sophistication of the buyers, there remain disputed issues of fact with respect to similarity of the marks, proximity of the products, likelihood that Levi will bridge the gap and Jordache's intent. Accordingly, summary judgment in favor of either party is

denied.[17] The Court next turns to Levi's motion for a preliminary injunction.

### III. Preliminary Injunction

Preliminary injunctions generally are granted where there is an urgent need for speedy action to protect a party's rights. *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985). Thus, in this circuit, a preliminary injunction may be issued only when the party seeking relief can make "a showing of (A) irreparable harm and (B) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Warner Bros. Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981). A showing of irreparable harm is a requisite element for obtaining a preliminary injunction under either prong of the standard. The Court finds that Levi has not satisfied this burden.

"In the preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm." *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir.1982). Significant delay in applying for injunctive relief in a trademark infringement case, however, "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d at 276.

In this case, while Levi diligently opposed Jordache's attempts to register various formulations of its "101" mark with the PTO, it was Jordache, rather than Levi, that commenced this action for declaratory relief. In fact, Levi refrained from moving for preliminary relief until more than a year after this action commenced, moving for a preliminary injunction as an alternative to its motion for summary judgment. Levi's failure to act sooner " 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.' " *Id.* at 277 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y. 1979)).

Moreover, the fact that Jordache's production of allegedly infringing jeans has been insignificant further supports the Court's finding that Levi has failed to establish irreparable injury. As Levi conceded in its moving papers,

> Jordache's total production of its 101 jeans has amounted to a mere 800 dozen[18], and sales have been so infinitesimal, scattered and sporadic in the national jeans market that the likelihood of Levi Strauss having *yet* discovered any circumstances of actual confusion in the marketplace is far smaller than the likelihood of finding the proverbial needle in the haystack.

*See* Def. Br. at 46. In view of Jordache's insignificant production of jeans bearing the "101" trademark, the likelihood of increased harm to Levi should the Court deny interim relief is minimal. Accordingly, as Levi has not satisfied its burden of establishing irreparable injury, its motion for a preliminary injunction is denied.

### IV. Common Law of Unfair Competition

The parties dispute whether Jordache's use of the "101" mark appropriates the advertising value and goodwill associated with Levi's "501" mark. The prerequisites for a claim for unfair competition closely parallel an action under the Lanham Act. *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. at 1280. Thus, in order to prevail under New York law, a plaintiff must demonstrate a likelihood of confusion between the two products. *Id.; Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d at 1048. Under limited circumstances, however, unfair competition may be found without a showing of likelihood of confusion. *See Diversified Marketing, Inc. v. Estee Lauder, Inc.*, 705 F.Supp. 128, 132 (S.D.N.Y.1988). Under the circumstances of this case, the Court concludes that a showing of likelihood of confusion is necessary.

---

17. For the reasons set forth above, Jordache's motion, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Levi's amended counterclaims also is denied.

18. That figure actually is 1800 dozen. *See* Jordache's Supplemental Rule 3(g) Statement at 2.

■ Levi contends that Jordache has misappropriated the commercial advantage that Levi obtained as a result of its extensive and expensive efforts to promote the "501" mark. Whether Jordache's mark unfairly competes, however, turns on the question of whether consumers are likely to be confused by the use of the "101" mark on jeans. "[O]ne can capitalize on a market or fad created by another provided that it is not accomplished by confusing the public into mistakenly purchasing the product in the belief that the product is the product of the competitor." *American Footwear Corp. v. General Footwear Co.*, 609 F.2d at 662. Accordingly, Levi must show likelihood of confusion in order to prevail under New York's unfair competition law. Moreover, as there are disputed issues of fact with respect to likelihood of confusion, *see* Discussion, *supra,* Part II., summary judgment in favor of either party on their claims regarding unfair competition is denied.

## V. Dilution

■ The parties contest whether Jordache's use of the trademark "Jordache Basics 101" dilutes the distinctive quality of the "501" trademark, in violation of N.Y.Gen.Bus. Law § 368–d. Pursuant to New York General Business Law section 368–d, a party is entitled to injunctive relief where there is a "[l]ikelihood of dilution of the distinctive quality of a mark or a trade name ... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y.Gen.Bus.Law § 368–d. " 'Dilution' in this context refers to a loss of distinctiveness, a weakening of a mark's propensity to bring to mind a particular product, service, or source of either." *Stop Olympic Prison v. United States Olympic Comm.*, 489 F.Supp. 1112, 1123 (S.D.N.Y.1980); *see also Mc-Donald's Corp. v. McBagel's, Inc.*, 649 F.Supp. at 1280.[19]

■ There are three essential factors to a claim of trademark dilution. The senior user must show that: (1) its trademark or name is either distinctive or has acquired secondary meaning; (2) the similarity between its mark and the junior user's mark results in a "whittling down" of the identity or reputation of the senior user's mark; and (3) the junior user acted with "predatory intent." [20] *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. at 1280 (citations omitted); *see also Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625–26 (2d Cir.1983).

### A. Distinctiveness and Secondary Meaning

■ To obtain relief under section 368–d, a party must demonstrate that its mark is either distinctive or has acquired a secondary meaning in the mind of the public. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). "In essence, distinctiveness in the antidilution realm may be evaluated in much the same way as strength of the mark is evaluated in the area of likelihood of confusion." *P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F.Supp. 662, 672 (S.D.N.Y.1985); *see also McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. at 1280.

As discussed, *supra,* in Part II.A.1., Levi's "501" mark is distinctive and has also acquired a secondary meaning. The "501" mark is arbitrary and fanciful, as it does not describe any particular quality or characteristic of jeans or jean apparel. The numeral "501" has also developed a powerful secondary meaning, identifying Levi as the source of the jeans and jean apparel. Accordingly, the Court finds that Levi has sufficiently established that its mark is distinctive and has secondary meaning.

### B. Likelihood of Dilution

■ The second element under section 368–d is likelihood of dilution. Dilution

19. While Jordache claims that the antidilution statute is not applicable here because Jordache and Levi are competitors, a recent Second Circuit case held that the New York statute applies to cases involving competitors as well as non-competitors. *See Nikon Inc. v. Ikon Corp.*, 987 F.2d 91 (2d Cir.1993). The Second Circuit held further that the anti-dilution statute is not preempted by the Lanham Act as they each protect different rights. *Id.*

20. "Although bad faith is not a necessary element under § 368–d, it is relevant in assessing such a claim." *Eastman Kodak Co. v. Rakow*, 739 F.Supp. 116, 119 (W.D.N.Y.1989).

is defined as a "whittling down" of the identity or reputation of a trademark. *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d at 625. It is an act " 'which threatens two separable but related components of advertising value. Junior uses may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey.' " *Id.* (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks, and Monopolies § 84.2, at 954–55). In order to find likelihood of dilution, there must be some mental association between the two party's uses of their respective marks. *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2d Cir.1989).

As the parties agree that Jordache manufactures a quality product, *see* Discussion, *supra,* at Part II.A.7., the Court finds no indication that Levi's mark is tarnished by any affirmative associations that Jordache's "101" mark conveys. Accordingly, the relevant inquiry is whether Jordache's "101" mark blurs Levi's product identification. Levi contends that Jordache's use of the "101" mark is likely to dilute the distinctive quality of Levi's "501" mark and to erode its selling power. Jordache claims, however, that its mark is not so "substantially similar" to Levi's "501" mark as to impair the distinctiveness of Levi's trademark. In light of these opposing contentions, the Court finds that the question of whether Jordache's use of the "101" mark is likely to dilute the distinctive quality of Levi's "501" mark is an issue of fact. *See Diversified Marketing, Inc. v. Estee Lauder, Inc.,* 705 F.Supp. at 134 (holding that the likelihood that plaintiff's use of defendant's name will whittle down the distinctive identity of defendant's name to be a fact issue to be determined at trial).[21]

### C. Predatory Intent

A defendant engages in conduct with predatory intent when he knowingly takes "unfair advantage of the business values developed by plaintiff. . . ." *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. at 1281 (quoting *Ferrara v. Scharf,* 466 F.Supp. 125, 134 (S.D.N.Y.1979)). As set forth, *supra,* in Part II.A.6., the issue of Jordache's intent is in

---

[21]. Levi contends further that the dilutive effect of Jordache's use of the "101" mark is confirmed by the Sorenson Survey. However, the Court

dispute. Accordingly, summary judgment in favor of either party on their dilution claims is precluded as a matter of law.

### CONCLUSION

For the reasons set forth above, Jordache's motion, pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, to dismiss Levi's amended counterclaims and for summary judgment on its amended complaint is denied. Similarly, Levi's motion, pursuant to Rule 56, for summary judgment is denied. Levi's motion for a preliminary injunction is also denied. The parties have ten days from the date of this Memorandum Opinion and Order to submit specific objections to the publication of this decision on the ground that matters set forth herein are confidential. Additionally, the parties are required to appear before this Court for a pretrial conference on Wednesday, January 19, 1994, at 10:30 a.m.

SO ORDERED.

finds that the survey, rather than establishing likelihood of dilution as a matter of law, is evidence to be analyzed by the jury at trial.