**PHILIP MORRIS INCORPORATED,**
Plaintiff,

v.

**STAR TOBACCO CORPORATION,**
Defendant.

No. 95 Civ. 321 (CSH).

United States District Court,
S.D. New York.

March 21, 1995.

Anthony L. Fletcher, Kristen H. Sorenson, Hunton & Williams, New York City, for plaintiff.

Henry F. Schuelke, Lawrence H. Wechsler, S. Robert Sutton, Janis, Schuelke & Wechsler, Washington, DC, William M. Brodsky, Baden, Kramer, Huffman & Brodsky, New York City, for defendant.

## MEMORANDUM OPINION
## AND ORDER

HAIGHT, District Judge:

In this Lanham Act case to which common and state law claims are appended, one manufacturer of cigarettes sues another for alleged infringement of trade dress and seeks a preliminary injunction.

### Background

Plaintiff Philip Morris Incorporated ("Philip Morris") manufactures and sells cigarettes under the brand name MARLBORO.[1] In December 1955, Philip Morris changed the MARLBORO brand from unfiltered to filtered cigarettes. It devised a new advertising format featuring pictures of a cowboy, which during the next decade was one of several elements featured in the marketing of MARLBOROs.

Since 1964, the brand has been marketed almost exclusively by advertising featuring cowboys and evoking the American West, with an emphasis upon the great outdoors. A typical early ad of this *genre*, attached as Exhibit A to the complaint, depicts a cowboy astride his horse in open country, lighting up a cigarette. The ad copy says: "Come to

where the flavor is … Come to MARLBORO COUNTRY." A later ad, playing off a blessed season of the year, shows a cowboy riding a horse through falling snow, leading another horse encumbered with a Christmas tree; the copy reads: "Merry Christmas from Marlboro Country." Packs of MARLBORO cigarettes sometime, but not always, display a picture of a cowboy. The print advertisements for the brand invariably do.[2]

Philip Morris's objective, one gathers, is to cause MARLBORO cigarettes to be equated in the public mind with vitality, virility, clean air, and good health. The MARLBORO COUNTRY campaign has achieved a smashing success, seemingly triumphing over the Surgeon General's health-related warnings tobacco companies are mandated to display on their products and in their advertising. In 1994, between 6 and 7 billion packs of MARLBORO cigarettes were sold in the United States. In 1974 MARLBORO became the world's best-selling cigarette brand. In 1974 it became the best-selling brand in the United States, a position it still maintains, currently with 28% of the domestic market. MARLBORO is aggressively marketed. During the past two decades MARLBORO domestic media advertising costs have exceeded $1.8 billion.

Defendant Star Tobacco Corp. ("Star") also manufactures and sells cigarettes. Star was incorporated in 1990. Until 1994 its principal business consisted of contract manufacturing of cigarettes and little cigars for private label marketers and exporters. In 1993 Star began to consider entering the cigarette marketplace under its own brand name. The result was a cigarette called GUNSMOKE, which Star began to test market in California in July 1994 and wishes to continue marketing on an expanded basis.

Jonnie R. Williams, Star's president, says in an affidavit that throughout the development of the GUNSMOKE concept he was

---

1. The factual account in text is derived from the pleadings, together with the affidavits and exhibits submitted on plaintiff's motion for a preliminary injunction. Neither party saw the need for discovery for an evidentiary hearing. No issue occurs to the Court which in my view would require an expanded factual record.

2. Owing to health concerns, the Federal government does not permit tobacco companies to advertise their products on television.

"well aware of Philip Morris' Marlboro brand and its use of a Western theme employing a 'Marlboro man' to market its product." *Id.* at ¶ 4. Williams says that in selecting a theme and brand name for Star's new cigarette, he "was attracted to a Western motif and believed there was room in the marketplace for a product that developed its own specific Western image or niche." *Id.* Williams characterizes the advertising and promotional efforts to market GUNSMOKE as an attempt "specifically to portray ourselves . . . as a competitor of Marlboro," thus implementing Star's intention "to make it perfectly clear that we were in competition with Marlboro and not associated with them." *Id.* at ¶ 17.

What Star actually did was to market GUNSMOKE cigarettes in packs featuring a drawing of a heavily armed cowboy, holding a rifle in his right hand and with his left hand resting upon a holstered pistol. The phrase "western blend" appears on the front of the pack.[3] Advertisements for GUNSMOKE cigarettes display, next to the cowboy figure, the phrase "New Man in Town."[4] One ad in a trade magazine, which Star says has not been repeated, said: "Welcome to Gunsmoke Country." Star contends that these marketing phrases were intended to tell the consumer that the GUNSMOKE man was a "new" man, hence not the MARLBORO man; and that the "GUNSMOKE Country" to which the consumer is welcomed is a place other than "MARLBORO Country." The Williams affidavit also says that Star made available to "certain of our distributors" vans displaying the GUNSMOKE man and GUN-SMOKE woman graphics and including the phrase: "Gunsmoke vs. Marlboro—Taste the Difference." *Id.* at 17. A photograph of such a vehicle appears as Exhibit F to the Williams affidavit.

Philip Morris does not regard Star's marketing strategies as a good-faith effort to educate cigarette consumers that GUN-SMOKE is not associated in any way with MARLBORO. On the contrary: Philip Morris regards Star as engaging in bad-faith trade dress infringement and related acts of unfair competition. On November 4, 1994 counsel for Philip Morris wrote to Star to demand "that you cease selling GUNSMOKE cigarettes and cease using MARLBORO's western motif for the trade dress or advertising of any cigarette." Star refused to comply. Philip Morris commenced this action.

The complaint pleads seven claims for relief. The first four are based upon § 43(a) of the Lanham Act, 15 U.S.C. § 1125 (Supp. 1994). Claims One and Two are for injunctive relief and money damages arising out of trade dress infringement in violation of § 43(a)(1)(A). Claims Three and Four are for injunctive relief and money damages arising out of false advertising in violation of § 43(a)(1)(B). Claims Five and Six allege common law palming off. Claim Seven alleges a violation of the New York Anti–Dilution statute, New York Business Law § 368–d.

Philip Morris moves for a preliminary injunction, which Star opposes.

### Discussion

While Philip Morris also asserts a Lanham Act false advertising claim,[5] it bases this motion for a preliminary injunction upon the Lanham Act trade dress infringement and New York Anti–Dilution Act claims.

■ A movant for a preliminary injunction must show both (1) irreparable harm in the absence of the requested relief and (2) either (a) a likelihood of success on the merits or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the movant. *See, e.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

---

**3.** Philip Morris says without contradiction that the tobacco industry knows no such thing as a "western blend."

**4.** Star also sells cigarettes in packs displaying a female figure in Western garb, holding a lariat (or some might say, a bullwhip).

**5.** The complaint alleges at ¶¶ 31–32 that Star's advertising falsely claims that GUNSMOKE cigarettes "feature no fillers or reconstituted tobacco," whereas in fact they contain not less than 10% and as much as 19% reconstituted tobacco.

*The Lanham Act Claim for Trade Dress Infringement*

### (a) The Merits

The Lanham Act, which governs plaintiff's federal claims, was intended to make "actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair competition." § 45, 15 U.S.C. § 1127. § 43(a) of the statute provides in pertinent part:

Any person who, on or in connection with any goods ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, ... which

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

"Trade dress" is a form of mark protectible under § 43(a)(1). "The 'trade dress' of a product is essentially 'its total image and overall appearance.'" *Blue–Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir.1989), cited and quoted by the Supreme Court in *Two Pesos, Inc. v. Taco Cabana, Inc.*, — U.S. —, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (hereinafter *"Two Pesos"*). *See also LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985) (trade dress comprises "the total image of a product."). A product's image may be created by "words, symbols, collections of colors and designs, or advertising materials or techniques that the purchasing public has come to associate with a single source." *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 503 F.Supp. 647, 649 (S.D.N.Y.1980), *aff'd* 644 F.2d 946 (2d Cir.1981).

■ Trade marks are often classified in categories of increasing distinctiveness. They may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. See *Abercrombie & Fitch Co. v. Hunting*

*World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976) (Friendly, J.) (cited in *Two Pesos* — U.S. at —, 112 S.Ct. at 2757). Trade dress is subject to those categories of classification. *Two Pesos* at —, 112 S.Ct. at 2757 (involving trade dress of a chain of fast-food restaurants serving Mexican food). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection" under § 43(a) of the Lanham Act. *Id.* To merit protection, trade dress, like any mark, must be nonfunctional. "Only nonfunctional, distinctive trade dress is protected under § 43(a)." *Two Pesos* at —, 112 S.Ct. at 2760. Merely descriptive marks do not qualify for protection under the Act unless they have acquired secondary meaning of a sort to make them distinctive of a particular source in commerce. *Two Pesos* at —, 112 S.Ct. at 2757. But inherently distinctive trade dress is protectible under § 43(a) without proof that the trade dress has secondary meaning. That is the holding of *Two Pesos*. *Id.* at —, 112 S.Ct. at 2761.[6]

■ In the case at bar, since 1973 Philip Morris by its packaging and advertising of MARLBORO cigarettes has created an image of the American West made up of geographical ("Marlboro Country") and individualized (the cowboy as the "Marlboro Man") components. This trade dress is inherently distinctive. Philip Morris says without contradiction that no cigarette manufacturer had evoked the image of the American West for the purpose of selling a particular brand until the Marlboro Man saddled up and rode into Marlboro Country. The juxtaposition of product and setting is entirely arbitrary, perhaps even fanciful. Accordingly the MARLBORO trade dress is protectible under § 43(a) of the Lanham Act, without (under the *Two Pesos* holding) any showing of secondary meaning.

All this counsel for Star professes to concede.[7] Star bases its defense upon the sec-

---

**6.** The Supreme Court's holding in *Two Pesos* specifically disapproved a line of cases in the Second Circuit, which had denied protection for even inherently distinctive trade dress in the absence of proof of secondary meaning. *See* dis-

cussion at — U.S. at —–—, 112 S.Ct. at 2759–2760.

**7.** Counsel for Star stated at oral argument:

ond issue common to Lanham Act trademark infringement claims. It is not enough for a Lanham Act plaintiff to establish that his mark or trade dress is entitled to the protection of the Act. "It is, of course, also undisputed that liability under § 43(a) requires proof of the likelihood of confusion." *Two Pesos* —— U.S. at ——, 112 S.Ct. at 2758. Star contends that the differences between GUNSMOKE's trade dress and that of MARLBORO are so great that only the Western motif is common to both. That leads, Star's argument continues, to the conclusions that consumers will not confuse the two brands; and that Philip Morris' evocation of the West—the sole point of similarity—is so diffuse as to be unprotectible.

■ In evaluating the likelihood of consumer confusion, courts frequently apply those nonexclusive factors articulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Adapting the *Polaroid* factors to trade dress analysis, they are: (1) strength of the prior user's trade dress; (2) degree of similarity between the two trade dresses; (3) proximity of the products; (4) likelihood that the prior user will bridge the gap; (5) actual confusion; (6) defendant's good faith; (7) quality of defendant's product; and (8) sophistication of the consumers. I will consider these factors. However, to define the context for that consideration, I will first deal with the several kinds of confusion the Lanham Act seeks to prevent; and the scope of the trade dress protection Philip Morris claims.

When similar products compete directly with each other in the retail marketplace, several potential forms of consumer confusion arise. First, consumers may mistake the product of the junior trademark or trade dress user for that of the senior user. Second, consumers may mistakenly believe that there is an association between the two products: in the case at bar, that GUNSMOKE is a price-discounted version of MARLBORO.

Third, and most pertinent to this case, there is that kind of confusion "that is likely to work to plaintiff's detriment—that is, defendant's ability to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well-known name." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 428 (S.D.N.Y.1980) (Sofaer, J.) (name of defendant's "adult" magazine PLAYMEN infringed name of plaintiff's popular and well-known magazine PLAYBOY).

In a trade dress case, that kind of confusion takes the form of a defendant's effort to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well-known trade dress.

A commercial competitor determined to gain that unfair foothold is assisted by human nature. Trade dress, like a trademark, "is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants." To that end, the trademark [and trade dress] owner makes "every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol." If he succeeds, the trademark or trade dress owner "has something of value"; and if "another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress." *Mishawaka Rubber & Woolen Manufacturing Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 1023, 86 L.Ed. 1381 (1942). That is so, even in the absence of proof of actual consumer confusion. *Id.* at 204, 62 S.Ct. at 1023.

Such poaching is possible because the "commercial magnetism" of a "congenial symbol" creates a favorable impression in the minds of consumers. That is the whole purpose of the exercise. It is the purpose that explains the existence of the advertising industry, marketing consultants, product pollsters, and related types. The consumer may not be fully aware of the effect of these efforts upon him, but he need not be. In the

Philip Morris maintains that it's Marlbobo [sic] trade dress is arbitrary and inherently distinctive.
We don't dispute that. As a matter of fact, while in the wake of the Supreme Court deci-

sion in *Two Pesos* it is no longer necessary for this analysis, I'm perfectly happy to concede that Philip Morris's Marlbobo [sic] dress has achieved secondary meaning.
Tr. 24.

words of District Judge Gurfein (as he then was): "The consumer does not memorize the mark. He has a feeling about it from past exposure. That feeling may be vague, subliminal it is said, but it comes to consciousness when the article is seen with the trademark affixed." *Londontown Manufacturing Co. v. Cable Raincoat Company,* 371 F.Supp. 1114, 1118 (S.D.N.Y.1974) (name of defendant's raincoat, SMOG, infringed name of plaintiff's well-known coat, LONDON FOG).

In *Dreyfus Fund, Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108 (S.D.N.Y.1981), that form of consumer confusion led to a holding that defendant's use of a lion logo to advertise its financial services infringed plaintiff's familiar lion symbol. "Since the Bank's 'Edge' campaign was designed to create a similar subliminal association with a lion, it is likely to be confused with the Dreyfus lion and to dilute the existing associations of such lions with Dreyfus." *Id.* at 1123.

*Dreyfus* cites *Londontown Manufacturing Co.* and *Grotrian, Helfferich, Schulz, Nachf v. Steinway & Sons,* 365 F.Supp. 707, 717 (S.D.N.Y.1973), for the proposition that consumer confusion need not "be overt or obvious to warrant preliminary relief." 525 F.Supp. at 1123. The Second Circuit affirmed *Grotrian.* 523 F.2d 1331 (2d Cir. 1975). The court of appeals upheld the district court's injunction in favor of the American manufacturer of the well-known Steinway piano against a German exporter into the United States of pianos bearing the trademark "Grotrian–Steinway." The Second Circuit quoted with approval this analysis in Judge MacMahon's opinion for the district court:

> "It is the subliminal confusion apparent in the record as to the relationship, past and present, between the corporate entities and the products that can transcend the competence of even the most sophisticated consumer.
>
> Misled into an initial interest, a potential Steinway buyer may satisfy himself that the less expensive Grotrian–Steinweg is at least as good, if not better than a Steinway. Deception and confusion thus work to appropriate defendant's good will. This

confusion, or mistaken beliefs as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company."

523 F.2d at 1341.

Relying on these and comparable cases, the main thrust of Philip Morris's trade dress infringement claim is that Star, seeking entry into the retail cigarette market, achieves an unfair advantage by means of a trade dress playing off consumers' consciousness, albeit perhaps subliminal, of the MARLBORO trade dress.

■ Secondly, Star argues that Philip Morris's trade dress infringement claim impermissibly stakes out the entire American West as its preserve. The argument is more rhetoric than substance. Philip Morris's MARLBORO trade dress does not focus widely upon the entire American West *qua* West. If it did, there might be some force to Star's defense that the dress is too diffuse to support injunctive relief. *Compare Dreyfus,* 525 F.Supp. at 1114 ("Plaintiffs are not entitled to protection from all lion marks."); *Londontown,* 371 F.Supp. at 1118 ("A manufacturer cannot preempt all weather as his exclusive mark, but by using an element in a fanciful sense he can appropriate an approximate synonym in popular use."). In the case at bar, Philip Morris paints with that more narrow and legally protectible brush. The trade dress Philip Morris seeks to protect consists of specific manifestations of a Western motif: the picture of a cowboy on a cigarette pack; figures of cowboys who have come over time to be known as the "Marlboro Man"; and those evocative stretches of the Western landscape, not to be found on any map or ordnance survey, called "Marlboro Country." The issue in this case is whether Star's trade dress for GUNSMOKE cigarettes infringes upon those particular manifestations of the Western motif chosen by Philip Morris for MARLBORO's trade dress.

■ I now turn to the *Polaroid* factors.

## 1. Strength of Philip Morris's Trade Dress

The strength of the MARLBORO trade dress appears sufficiently from the previous

discussion. Cigarettes are not inherently associated with cowboys or the West. Accordingly the trade dress is arbitrary or fanciful, and at the upper end of the strength scale. Furthermore, the duration and extent of the MARLBORO campaign and its commercial success are sufficient to establish a powerful secondary meaning, were that required.

This factor weighs in Philip Morris's favor.

### 2. Degree of Similarity Between the Two Trade Dresses

GUNSMOKE's trade dress is similar to that of MARLBORO in respect of the three key aspects discussed *supra.* One of the MARLBORO line of cigarettes displays a picture of a cowboy on the pack; so do the GUNSMOKE packs. GUNSMOKE ads feature the phrase "New Man in Town," a phrase evocative of the Marlboro Man. One GUNSMOKE ad welcomed the consumer to "Gunsmoke Country," equally evocative of "Marlboro Country." While that particular ad, appearing in a trade publication, has apparently not been repeated, counsel for Star declined at oral argument to foreswear using the "Gunsmoke Country" phrase in the future.

In addition, GUNSMOKE cigarettes are sold in packs the predominant color of which is red, as are MARLBOROs. The typeface used for the word "GUNSMOKE" on the packs is similar to that used for the word "MARLBORO" on those packs.

■ Counsel for Star stress differences in the aspects of the cowboys. The MARLBORO cowboys, appearing in photographs, are clean-shaven, wholesome-appearing, and unarmed. The GUNSMOKE cowboy, appearing in an artist's sketch, is slit-eyed, messily unshaven, brandishes a rifle, and projects an air of menace. Star also says that it did not copy all the details of the MARLBORO pack and that other brands use packs or boxes that are predominantly red in color. These points may be conceded, but they do not materially detract from the overall similarity of the trade dresses. In that regard, I reject Star's contention that the

advertising phrases "New Man in Town" and "Gunsmoke Country" proclaim to consumers with sufficient clarity that GUNSMOKE is an entirely different and competing product. A competitor may use another product's trade name for the purpose of comparative advertising, so long as the advertising claims are not false. *See Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57 (2d Cir.1992). Star's proclamation on vans making deliveries to distributors of GUNSMOKE's superiority over MARLBORO is a legitimate form of comparative advertising. But the packaging and print advertisements, directed at retail consumers, cannot be so characterized. They can readily be regarded as efforts to trade upon the consumers' subliminal awareness of MARLBORO.

The similarities between the trade dresses of MARLBORO and GUNSMOKE weigh in Philip Morris's favor.

### 3. Proximity of the Products

The products are identical.[8] That is also a factor weighing in Philip Morris's favor on the likelihood of consumer confusion.

### 4. Bridging the Gap

This *Polaroid* factor seeks to protect the senior user's interest in being able to enter a related field at some future time. *Lois Sportswear, Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 874 (2d Cir.1986). It is not a relevant consideration in the case at bar.

### 5. Actual Confusion

On this motion Philip Morris offers no evidence of actual confusion, either anecdotal or by consumers' surveys. The only evidence directly addressing the issue comes from Star, which produced two letters from consumers apparently reflecting an awareness that the products were different.

■ Nonetheless, in the circumstances of this case I decline to draw an inference against Philip Morris based on the lack of proof of actual confusion. Where, as in the instant case, the junior user's product has been on the market a relatively short time,

8. I mean by that only that MARLBORO and GUNSMOKE are both cigarettes. The tobacco

blends employed may be different, but that is not material.

lack of proof of actual confusion does not warrant an inference against the senior user on the issue of probable confusion. *Hasbro, Inc. v. Lanard Toys*, 858 F.2d 70, 78 (2d Cir.1988); *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 518 (S.D.N.Y.1993).

▌ In addition, there is sufficient evidence in the record from which to infer that Star intentionally copied Philip Morris's MARLBORO trade dress. That circumstance justifies a presumption of confusion, even in the absence of actual proof. *Perfect Fit Industries, Inc. v. Acme Quilting, Inc.*, 618 F.2d 950, 954 (2d Cir.1980). A "reasonable likelihood" of consumer confusion entitles the senior user to equitable relief, although there is no proof that particular purchasers were actually deceived. *Mishawaka Rubber & Woolen Manufacturing Co v. S.S. Kresge Co.*, 316 U.S. at 204, 62 S.Ct. at 1023.

### 6. Star's Good Faith

The junior user's good faith in selecting a trade name, mark or dress is a significant factor because the granting or withholding of injunctive relief turns upon principles of equity.

"Evidence of intentional copying by a junior user may be indicative of an intent to create a confusing similarity between the products." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir.1992).

In his affidavit Williams, Star's president, describes his desire to take advantage of the current commercial popularity of all things Western. Williams concedes his familiarity with MARLBORO cigarettes and that brand's western motif, but says he intends GUNSMOKE cigarettes to compete with MARLBORO not to imitate them. He describes the manner in which he came up with the name "GUNSMOKE" for a cigarette; a word inspired by a personal hunting incident, and also reminiscent in William's mind of the popular television program of some years ago (starring James Arness as Marshal Matt Dillon). Williams describes the steps leading up to the artistic creation of the cowboy drawing used as part of GUNSMOKE trade dress.

These protestations of good faith are all very well as far as they go. But they do not go very far. They fall well short of explaining why Star chose to associate a cigarette with a cowboy, and to embark upon an advertising campaign whose slogans closely resemble Philip Morris's.

The present record contains evidence from which a factfinder could without difficulty draw the inference that Star acted with "an intent to create a confusing similarity between the products." Thus this *Polaroid* factor also weighs in Philip Morris's favor.

### 7. Quality of Defendant's Product

There is no evidence in the record concerning the precise blends, mixes or characteristics of the tobaccos used in these two brands of cigarettes. Philip Morris has not attempted to show that the GUNSMOKE brand is a distinctly inferior product. Presumably Star would not concede that to be the case. Assuming *arguendo* that the quality of GUN-SMOKE cigarettes is as good as that of MARLBOROs, there is authority for the proposition that the good quality of the alleged infringer's product actually may increase the likelihood of confusion as to source. *Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986). I think that proposition applies to the case at bar, and accordingly conclude that this factor favors Philip Morris.

### 8. Sophistication of Buyers

▌ It is generally held that unsophisticated consumers in the relevant market "aggravate the likelihood of confusion." *Hasbro v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir.1988). Nevertheless, it is also recognized that the sophistication of consumers, while usually militating against a finding of a likelihood of confusion, "might on occasion increase the likelihood of confusion, depending upon the circumstances of the market and the products." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1228 (2d Cir.1987).

In the case at bar, the relevant consumers are purchasers of cigarettes at retail. That is to say, we are not dealing with distributors

388

of cigarettes, who presumably know from whom they purchase their inventories.

One does not immediately think of cigarette buyers as particularly sophisticated as a group. But the remarkable commercial success of Philip Morris's MARLBORO brand indicates that a very large number of regular consumers view the MARLBORO trade dress—the cowboy transformed into the "Marlboro Man" inhabiting "Marlboro Country"—with sufficient approval to influence their purchasing decisions. And if one characterizes that sort of consumer decision making as "sophisticated", then it is a form of sophistication that actually increases the likelihood that these consumers would be confused by GUNSMOKE's similar trade dress. *Compare Lois Sportswear U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d at 875 ("[W]e believe that it is a sophicated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattering on appellant's jeans indicates some sort of association between the two manufacturers. Presumably it is these sophicated jeans buyers who pay the most attention to backpocket stitching patterns and their 'meanings.' "). I find that in the circumstances of the case, this factors favors Philip Morris.

\* \* \* \* \* \*

I conclude that Philip Morris has demonstrated the likelihood of succeeding on its Lanham Act claim that the trade dress designed by Star for GUNSMOKE cigarettes infringes upon the trade dress of MARLBORO cigarette. I base that conclusion upon the likelihood that the similarities in trade dress will give Star an unfair advantage in the market place through consumers' confusion, perhaps subliminal, between the two brands; and consumer's association, again perhaps subliminal, of Star's brand with that of Philip Morris.

I further conclude that consideration of the *Polaroid* factors increases the likelihood of confusion, and hence the likelihood that Philip Morris will succeed on its Lanham Act claim.

*(b) Irreparable Harm*

■ Philip Morris has demonstrated the likelihood of success on the merits of its Lanham Act Claim. Accordingly I need not reach the second prong of the standard governing the issuance of a preliminary injunction. However, I must consider whether Philip Morris has demonstrated irreparable harm, since that is a requisite element for obtaining a preliminary injunction under either prong of the standard.

It is well settled that "[i]n the preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm." *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir.1982). Such circumstances give rise to a logical presumption that the senior user will be harmed in the market place. Because the value of the harm resulting from consumer confusion is difficult to quantify, "irreparable injury will almost always be found when there is a high probability of confusion." *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. at 429. *See also LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 79 (2d Cir.1985) ("Likelihood of confusion is itself strong evidence that in the absence of an injunction [plaintiff] might face irreparable harm.").

An infringement plaintiff's significant delay in applying for injunctive relief "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir.1985).

Applying these principles to the case at bar I conclude that Philip Morris has made the requisite showing of irreparable harm.

I further conclude that Philip Morris sought a preliminary injunction with reasonable dispatch after becoming aware of the scope and nature of Star's marketing strategies. Accordingly there is no basis for rebutting the presumption that Philip Morris will suffer irreparable harm as a result of Star's infringing trade dress.

*The State Law Anti–Dilution Claim*

Philip Morris also asserts a claim under New York General Business Law § 368–d. The statute entitles a party to injunctive relief where there is a "[l]ikelihood of dilution of the distinctive quality of a mark or a trade name ... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

 To sustain a claim under the statute, the senior user must show that: (1) its trademark, trade name or trade dress is either distinctive or has acquired secondary meaning; (2) the similarity between its mark and the junior user's mark results in a "whittling down" of the identity or reputation of the senior user's mark or dress; and (3) the junior user acted with "predatory intent." *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1280 (S.D.N.Y.1986) (citing cases); *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625–26 (2d Cir.1983).

My findings and conclusions with respect to Philip Morris's Lanham Act claim also serve to demonstrate its entitlement to a preliminary injunction under the New York statute. An injunction will issue on the basis of that statute as well.

*Security*

 Rule 65(c), Fed.R.Civ.P., provides that no preliminary injunction shall issue except upon the giving of security by the movant, "in such sum as the court deems proper for the payment of such costs and damages as may be incurred or suffered by any party who is found to be wrongfully enjoined or restrained."

It is clear that the issuance of a preliminary injunction, bringing to a halt the present forms and expressions of Star's efforts to market GUNSMOKE cigarettes, will have an adverse economic impact upon Star. The parties were entirely unable to agree on the appropriate amount of security. The record does not contain hard economic evidence on the issue. Having considered the supplemental written submissions of the parties, I will require Philip Morris to post a bond in the amount of $5 million.

*Conclusion*

For the foregoing reasons, plaintiff's motion for a preliminary injunction is granted.

Counsel for plaintiff are directed to settle an order of preliminary injunction consistent with this opinion on seven (7) days' notice. In addition to the amount of security referred to above, the injunction must also provide for a stay of its effect for ten (10) days. Application by the defendant for any further stay must be made to the court of appeals.

The foregoing is SO ORDERED.